2001 WY 78

**WYOMING BOARD OF OUTFITTERS AND PROFESSIONAL GUIDES,**
Appellant (Respondent),

v.

**D. Kenneth CLARK, Appellee (Petitioner).**

**Wyoming Board of Outfitters and Professional Guides, Appellant (Respondent),**

v.

**D. Kenneth Clark, Appellee (Petitioner).**

Nos. 00–271, 00–272.

Supreme Court of Wyoming.

Aug. 27, 2001.

---

Gay Woodhouse, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; and Eugene W. Jackson, Assistant Attorney General, for Appellant.

James E. Phillips of James E. Phillips, P.C., Evanston, WY, for Appellees.

Before LEHMAN, C.J., and GOLDEN, HILL, and KITE, JJ.

HILL, Justice.

[¶1] Appellant, the Wyoming Board of Outfitters and Professional Guides (Board), challenges an order of the district court reversing the Board's decision to deny a guide's license to Appellee, D. Kenneth Clark (Clark). We will affirm the district court, but on grounds dissimilar to those relied upon by that court.

## ISSUES

[¶2] The Board offers this statement of the issues:

I. Did the district court err in ruling the Board had no statutory rule-making authority to deny a professional guide's license?

II. Did the district court err in ruling that the Board's decision to deny a license to Clark was arbitrary and capricious?

Clark abbreviates the issue thus:

A. Did the district court correctly rule that the Appellant's decision to deny Appellee a professional guide's license was arbitrary, capricious, an abuse of discretion, and contrary to law.

## FACTS

[¶3] Clark began working in the outfitting and guiding business in 1967. In 1995, Clark was charged with a Lacey Act violation for illegally tagging a deer that was shot by one of his clients who did not have a license to shoot a deer. Clark entered a plea of guilty to that violation in Federal court, and, as a result of a plea bargain, he was sentenced to two years' probation, a fine of $5,000.00, and revocation of his United Sates Forest Service (USFS) Special Use Permit and his commercial outfitting-guide operations on National Forest lands. In addition, Clark surrendered his outfitter's license to the Board. Clark was permitted to sell his hunting camp operation to Gary Amerine, with the condition that Clark would have nothing to do with operation of that business

in accordance with the USFS conditions of Clark's sale of the business to Amerine.

[¶4] On July 6, 1998, Clark was issued a conditional guide's license, which permitted Clark to guide only for Robert Barlow. An additional condition of that license was that Clark was to obtain prior approval from the Board before he could work for any outfitter other than Barlow. On August 1, 1998, Clark submitted a request to the Board to work as a guide for Amerine. Clark appeared at the Board's meeting on August 24, 1998, to pursue that request, as well as an apparent request to work for Gregg Fischer.[1] However, the Board denied Clark's request to work for either Amerine or Fischer because of the USFS's limitation with respect to Amerine and the close proximity of Amerine's camp to that of Fischer's. According to the Board's brief, the purpose to be served by this limitation/condition was to avoid the appearance of impropriety by not allowing Clark back into the same location where his acts led to his conviction. Clark then amended his request to work for Dale Clark.

[¶5] The Board asked Clark what the distance was between Amerine's area of operation and that of Dale Clark. Clark informed the Board that the two areas (or "camps") were approximately 28 miles apart. The minutes of the Board's meeting indicate that Clark represented to the Board that Dale Clark's camp was "about 28 miles away from Amerine's camp." On September 11, 1998, Mesia Nyman, District Ranger for the USFS in the Greys River Ranger District, sent a letter to the Board indicating that Clark's statement that Dale Clark's camp was 28 miles from Amerine's camp was misleading. Nyman stated in her letter that Dale Clark did not have a camp, that both Amerine and Dale Clark shared the same day-use area, and that the situation made it impossible to manage and monitor Clark's role as a guide (i.e., whether he was working for Amerine or Dale Clark). Nyman asked that the Board reconsider its decision to allow Clark to work for Dale Clark.

---

1. The Board appears to have treated Clark's presentation as a request to work for Fischer. However, the minutes of the Board meeting do not reflect such a request, and it was Clark's contention that he did not ask to guide for Fischer but only that he could guide for Fischer if permission were granted.

[¶ 6] As a result of Nyman's letter to the Board, the Board conducted an investigation. By letter dated December 16, 1998, the Board informed Clark that he was in violation of the conditions imposed on his 1998 license and directed that Clark surrender his license, which he did. That license indicated that Clark had worked for only Barlow and Dale Clark during the 1998 season.

[¶ 7] It is not disputed that Clark submitted an application to renew his guide's license for the 1999 season, nor is it disputed that the Board denied his application for the reasons that Clark's 1998 application contained "false information," as well as because of his "unprofessional conduct toward Game & Fish Warden Hyde and Forest Service officer Nyman during a routine license check last fall."

[¶ 8] In a March 3, 1999 pleading filed before the Board, Clark requested a hearing on the denial of his 1999 guide's license application. On June 17, 1999, a hearing was held pursuant to Clark's request. We will not set out in detail the evidence at this juncture but will refer to the pertinent portions of that record in the course of our discussion of the issues. The end result of the hearing was that Clark was denied a license for the 1999 season. The Board's basis for denial was memorialized in the Findings of Fact, which we set out here in detail:

### FINDINGS OF FACT

1. We find that D. Kenneth Clark (Clark) previously held a 1998 professional guide license, as conditioned by the Board, in Wyoming.

2. We find that on or about August 24, 1998, Clark engaged in substantial misrepresentation, presented material false statements and failed to disclose material facts to the Board in supporting his request to amend the condition restricting the outfitter he could work for pursuant to his conditional 1998 professional guide license issued on or about July of 1998. Pursuant to his conditional license, Clark could only guide for Barlow Outfitting unless he appeared before the Board and requested approval to guide for another outfitter.

3. Specifically, we find that Clark attended the Board's regular meeting on August 24, 1998 to answer questions regarding Clark's request to guide for Gary Amerine (Amerine) because Barlow Outfitting could only hire him as a guide for one hunt. Clark stated that Gregg Fischer (Fischer) was going to hire him as a guide, (implying that he had spoken to Fischer), but that Clark failed to disclose to the Board that he did not talk to Fischer prior to attending the meeting. We find that Clark did not talk to Fischer until December of 1998; after the hunting season was over.

4. We find that Clark's statement that Fischer would hire him as a guide was substantially misleading in that the statement implied that Clark had spoken to Fischer to [sic] before the August 28, 1998 meeting, when he had not. We further find that Clark's statement was reasonably calculated to cause the Board to amend the conditions of his 1998 professional guide license.

5. We find that on the same date as set forth in paragraph 2, Clark returned to the meeting and represented that Dale Clark (D.Clark) would hire him as a guide for the 1998 hunting season. In supporting his request to guide for D. Clark, Clark represented that D. Clark operated his outfitting business mainly in the Salt Creek River Drainage and lower half of Grey's River. When questioned about the distance of D. Clark's operating area from Amerine's camp, Clark represented to the Board that the camp was about twenty-eight (28) miles away from D. Clark's operating area. Clark failed to inform the Board that D. Clark's and Amerine permitted usage areas actually overlapped and that D. Clark's authorized area was within seven (7) miles of Amerine's camp.

6. We find that Clark is familiar with the Grey's River and Salt Creek River District as he has lived in the area for forty-nine (49) years and has been professionally outfitting and guiding the area for thirty-one (31) years, as represented by Clark in his testimony and application for a professional guide license. As such, Clark knew he was misrepresenting to the Board that the distance from Amerine's camp to D.

Clark's operating area was about twenty-eight (28) miles. We find that Clark's misrepresentation was reasonably calculated to cause the Board to amend the conditions of his 1998 professional guide license.

7. We find that Clark's failure to advise the Board that Amerine's operating area and D. Clark's operating area overlapped was an intentional omission of a material fact to the Board which was reasonably calculated by Clark to cause the Board to amend the conditions placed on his 1998 professional guide license.

8. We find that Clark's activities as described in paragraphs 1 through 7 of the Findings of Fact constitute unethical and/or dishonorable conduct pursuant to the Board's Rules and Regulations, Chapter 3, Section 1(t).[2]

9. We find that on or about October 8, 1998, Clark and his hunters were subjected to a routine licensure check by Mésia Nyman (Nyman), District Ranger for the United States Forest Service on the Bridger–Teton Forest, Grey's River Ranger district, and Kemmerer Ranger District, and Duane Hyde (Hyde), Game Warden for the Wyoming Game and Fish Department.

10. We find the testimony of Nyman and Hyde to be credible in that they presented a consistent account of the events surrounding the licensure check of Clark and his party of hunters.

11. During the license check, we find that Clark intentionally handled livestock in a manner that was intended to interfere with Hyde when he was checking hunters' licenses. Clark led the livestock near Hyde and jerked the lead rope of the horse causing the horse to rear. This action caused the horse to nearly step on Hyde's foot.

12. We find that Clark further interfered with the license check in refusing to answer questions asked by Hyde pertaining to the area he was guiding the hunters. We find that Hyde asked Clark where he had been hunting and Clark answered "What do you want to know for?" We find that Hyde responded: "I'd like to know.", [*sic*] and Clark did not respond with a

direct answer, but stated: "You've got some real problems going on in there." Without further comment to Hyde, Clark walked away and left the scene.

13. We find that Clark's activities as set forth in paragraphs 9 through 12 constitute unethical and/or dishonorable conduct pursuant to the Board's Rules and Regulations, Chapter 3, Section 1, for failing to cooperate with State and Federal wildlife officials.

[¶ 9]  Clark next filed a petition for review in the district court, under W.R.A.P 12.03, seeking to further challenge the action of the Board in denying his guide's license for 1999. The essence of the district court's decision to reverse the action of the Board was that a person is *entitled* to a guide's license so long as that person is 18 years of age and is employed by a licensed outfitter. Wyo. Stat. Ann. § 23–2–412(a) (LexisNexis 2001). The district court held that nothing more is required and, thus, the Board lacked statutory authority to deny Clark a license because he met the statutory qualifications.

### STANDARD OF REVIEW

[¶ 10]  The standard of review for judicial review of agency action is set forth in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2001):

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

---

**2.** (t) A licensee shall not violate any provision of   the act.

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) in excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

See *Dorr v. Board of Certified Public Accountants*, 2001 WY 37 ¶ 8, 21 P.3d 735, ¶ 8 (Wyo.2001)

## DISCUSSION

[¶ 11]  We do not agree with the district court's conclusion that the Board is so hobbled by statute that it must issue a guide's license so long as the applicant is 18 years old and employed by a licensed outfitter, without regard for any other facts or circumstances including the applicant's history of performance under licenses issued by the Board.  In this circumstance, Clark surrendered his outfitter's license because of a felony conviction, and he surrendered his 1998 guide's license because of problems he encountered during that season.  Clark did not seek review of either of those actions of the Board, and they are now at repose.

[¶ 12]  We must first explore the language contained in all of the statutes pertaining to the purposes and powers of the Board with respect to issuing licenses.  The map we use in examining these statutes is that found in our conventions with respect to the construction of statutes.  In interpreting statutes, our primary consideration is to determine the legislature's intent.  All statutes must be construed in pari materia and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony.  Statutory construction is a question of law, so our standard of review is *de novo.*  We endeavor to interpret statutes in accordance with the legislature's intent.  We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection.  We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in pari materia.  *Fontaine v. Board of County Commissioners of Park County,* 4 P.3d 890, 894–95 (Wyo.2000) (and cases cited therein);  and *see Wyoming Department of Transportation v. Haglund,* 982 P.2d 699, 701–3 (Wyo.1999);  and *Richards v. Board of County Commissioners of Sweetwater County,* 6 P.3d 1251, 1253 (Wyo.2000).

[¶ 13]  The introductory clause in the act governing the Board is set out in Wyo. Stat. Ann. § 23–2–401(a) (LexisNexis 2001):

(a) No nonresident shall hunt big or trophy game animals on any designated wilderness area, as defined by federal or state law, in this state unless accompanied by a licensed professional guide or a resident guide.  There shall be at least one (1) licensed professional guide or resident guide accompanying each two (2) nonresident hunters.  The commission may also specify other areas of the state, or specific big or trophy game species, for which a licensed professional or resident guide is required for nonresidents, *for purposes of proper game management, protection of hunter welfare and safety, or better enforcement of game fish [sic] laws.*  The commission may allow licensed guides to accompany more than two (2) hunters but no more than six (6) hunters in specific areas.

(Emphasis added.)

[¶ 14]  The series of statutes that follows invests the Board with the responsibility to ensure that outfitters and guides to whom it issues licenses possess the qualifications necessary to carry out the purposes set out in the emphasized portion of the statute.  The additional statutory requirements that a guide be at least 18 years of age and employed by an outfitter do nothing to ensure that the Board's ultimate responsibilities are met.

[¶ 15] The powers and duties of the Board are found in Wyo. Stat. Ann. § 23-2-410 (LexisNexis 2001):

(a) The board shall:

(i) Adopt an official seal;

(ii) *Carry out the provisions of this act and in accordance with the Wyoming Administrative Procedure Act, adopt necessary rules and regulations for carrying out this act including requirements for training, experience and knowledge of relevant law and rules and regulations as may be imposed upon outfitters and professional guides, the content and requirements for examination of license applicants and other necessary and reasonable rules;*

(iii) Report to the governor in accordance with W.S. 9-2-1014.

(b) The board may employ personnel as required to carry out this act and establish compensation for any employees subject to legislative budget authorization. In enforcing this act and its rules and regulations, the board shall require investigators to receive peace officer training and qualification under W.S. 9-1-701 through 9-1-708.

(c) *The board shall license and regulate outfitters and professional guides in this state and shall:*

(i) *Examine applicants for licensure under this act;*

(ii) *Deny or approve applications for licensure and may revoke or suspend licenses in accordance with this act and its rules and regulations;*

(iii) Conduct hearings upon complaints received relative to licensees;

(iv) *Impose reasonable restrictions and limitations upon licensees as necessary to implement this act;*

(v) Designate areas within the state as recommended by the commission for game management purposes in which a licensee may conduct outfitting or professional guiding under the license;

(vi) Repealed by Laws 1991, ch. 156, § 2.

(d) Unless a court issues a search warrant based on probable cause that a private property owner is engaged in illegal outfitting activities, investigators of the board shall not enter onto private property without express permission from the property owner. The board shall not require private landowners to sign an authorization form for outfitters licensed by the board to enter lands owned by the person.

(Emphasis added.)

[¶ 16] The emphasized portion of the statute immediately above empowers the Board to adopt rules and regulations designed to ensure that persons licensed under these statutes are qualified to perform services as an outfitter or guide.

[¶ 17] The statutory qualifications for professional guide's license are set out in Wyo. Stat. Ann. § 23-2-412 (LexisNexis 2001):

(a) An applicant for a professional guide's license under this act shall meet the following qualifications:

(i) At least eighteen (18) years of age;

(ii) Employed by or operating under an independent contract with a licensed outfitter;

(iii) and (iv) Repealed by Laws 1991, ch. 156, § 2.

(b) A professional guide's license issued under this act is valid only while the licensee is employed by or operating under an independent contract with a licensed outfitter.

(c) Once in every twelve (12) month period, an applicant may receive a license allowing him to provide guiding services under this act for not more than fourteen (14) consecutive days by paying the fee set forth in W.S. 23-2-414.

(d) A licensed outfitter contracting with a professional guide for guiding services shall be responsible for the conduct of the independent contractor guide as if he were an employee.

(e) In addition to subsection (a) of this section, an applicant for a professional guide's license shall report:

(i) *Any conviction or forfeiture of any bond amount for a violation of federal or state law or applicable regu-*

*lation relating to wildlife, game and fish within five (5) years before the date of filing license application;*

*(ii) Any felony conviction; and*

*(iii) Any conviction for a violation of federal or state law relating to criminal fraud and occurring within five (5) years prior to the date of filing application.*

(Emphasis added.)

■ [¶ 18] We view this statute as empowering the Board to consider the information an applicant is required to report under the emphasized portion of the statute in granting, denying, or limiting the issuance of a license. Any other construction would fully negate these provisions.

[¶ 19] In fulfillment of Wyo. Stat. Ann. § 23-2-413 (LexisNexis 2001), the Board has adopted a form for submitting an application for a guide's license.

(a) Application for a license authorized by this act shall be made upon a form prescribed and furnished by the board, contain information required by the board and be signed by the applicant. The board may impose an application fee of not to exceed a reasonable amount necessary to defray the costs incurred in processing the application, administering the examination required by this section and conducting necessary investigation.

(b) Each applicant for a license under this act shall submit to examination by the board. The examination shall be administered by the board and shall:

(i) Be standardized for each type of license issued under this act;

*(ii) Require sufficient knowledge of the services to be provided under the license;*

*(iii) Test the ability of the applicant to perform services under the license in a safe manner;* and

*(iv) Require special knowledge applicable to the particular type of license for which application is made.*

*(c) In addition to examination under subsection (b) of this section, the board may investigate the qualifications of the applicant to ensure compliance with this act.*

(d) The board shall require the applicant for a license under this section to post and maintain a liability insurance policy to protect clients and property owners against injury or damage as a result of negligence by outfitters or their agents or employees. The limits of coverage shall be not less than twenty-five thousand dollars ($25,-000.00) for property damage and for personal injury or death, not less than one hundred thousand dollars ($100,000.00) for injury to or death of one (1) person and not less than three hundred thousand dollars ($300,000.00) for all injuries or death from any one (1) occurrence.

(Emphasis added.)

[¶ 20] The Board has power to suspend or revoke licenses, as set out in Wyo. Stat. Ann. § 23-2-416 (LexisNexis 2001):

(a) The board may require payment of damages as provided by subsection (b) of this section or suspend or revoke a license issued under this act for any of the following causes:

(i) Fraud or substantial misrepresentation in obtaining a license under this act;

(ii) Fraudulent advertising;

(iii) Conviction of a felony;

(iv) Violation of any significant federal or state law or related regulations pertaining to wildlife, game and fish;

(v) Unethical or dishonorable conduct;

(vi) A substantial breach of contract with any person using outfitting or professional guiding services of the licensee;

(vii) Willful violation of the terms and conditions under which the license is issued;

(viii) Inhumane treatment of any animal;

(ix) Willfully endangering the health and safety of any person;

(x) Violation of this act or any rule or regulation of the board.

(b) If a client of an outfitter or professional guide licensed under this act is injured by any of the causes specified under

subsection (a) of this section, the board may require the outfitter or guide as a condition of returning his license, to pay to the client any court ordered damages including any:

(i) Fees paid by the client to the outfitter or guide;

(ii) Actual travel and lodging expenses incurred by the client in attempting to use the outfitter's or guide's services; and

(iii) Other actual expenses incurred by the client in attempting to use the outfitter's or guide's services.

(c) Except as provided in subsection (d) of this section, suspension and revocation proceedings under this section shall be conducted in accordance with the Wyoming Administrative Procedure Act.

(d) Upon receipt from the department of family services of a certified copy of an order from a court to withhold, suspend or otherwise restrict a license issued by the board, the board shall notify the party named in the court order of the withholding, suspension or restriction in accordance with the terms of the court order. No appeal under the Wyoming Administrative Procedure Act shall be allowed for a license withheld, suspended or restricted under this subsection.

[¶ 21] The record does not reveal what examination process, if any, is employed by the Board. The Board does use an application form that solicits identifying information, including the applicant's age. It also requires the applicant to divulge information about convictions made relevant by the statutes set out above, the name of the outfitter for whom the applicant intends to work, if the applicant has previously been licensed as a guide, and if not, the applicant's training and experience for guiding and knowledge of the area in which the applicant intends to guide, as well as the source of that knowledge. The only "stain" on Clark's record was his Lacey Act conviction, but the Board made a decision to issue a conditional license in any event (the condition being that he could not work for Amerine or in the vicinity of Amerine's area of operation). No interested party challenged the issuance of that license.

[¶ 22] As noted above, Ranger Nyman lodged what may be characterized as an objection to Clark working as a guide for Dale Clark because Dale Clark's area of operation was too close to Amerine's area of operation in that they were both permitted to operate in the same day-use area (we note at this juncture that no evidence was ever presented that they did, in fact, actually operate in the same day-use area or that the two outfitters ever operated even in close proximity to one another, only that such was a possibility). Included in the exhibits is a map of the Bridger–Teton National Forest that was used to demonstrate the boundaries of the various outfitters' areas of operation. The map is of some marginal utility, but the evidentiary markings on it can best be described as resembling the borders and battle lines of an all-out Balkan's war. We are persuaded that, based upon Nyman's objection to Clark working for Dale Clark, such objection would apply to all outfitters operating in the Bridger–Teton National Forest (in theory, though perhaps not in actual application). Nonetheless, the Board approved Clark's request to serve as a guide for Dale Clark. We will return to this subject later in the opinion; however, we make mention of Nyman's letter here because it caused the Board to initiate an investigation which resulted in disciplinary action being taken against Clark.

[¶ 23] As noted above, the Board denied Clark a license when he applied for a 1999 season license. Although it does not form a basis for our affirmance of this case, it is necessary as a threshold matter to briefly discuss the hearing officer's determination that the burden of proof in the hearing before the Board was on Clark. The hearing officer made reference to *JM v. Department of Family Services*, 922 P.2d 219, 221–22 (Wyo.1996) to justify that ruling. Our decision in *JM* is not directly applicable to the circumstances of this case. In quoted material, we did include the statement, "an applicant for benefits or for a license is the proponent in eligibility determinations," but to the extent the quoted phrase is applicable, Clark

had already met his burden of proof. 922 P.2d at 221 (quoting 4 Jacob A. Stein, et al., Administrative Law § 24.02 at 24–21 (1987)). Based on the circumstances of this case, the provisions of Wyo. Stat. Ann. § 23–2–414[3] (LexisNexis 2001), and Wyo. Stat. Ann. § 16–3–113[4] (LexisNexis 2001), once Clark established the qualifications for licensure, the burden of proof should have shifted to the Board to go forward with its evidence justifying the denial of Clark's license, though Clark had the burden of persuading the Board that its grounds for denial were insufficient under the governing statutes and regulations. *See JM*, 922 P.2d at 221–22; *also see Casper Iron & Metal v. Unemployment Insurance Commission*, 845 P.2d 387, 393–94 (Wyo.1993).

■ [¶ 24] The dispositive issue in this case is whether there is substantial evidence to support the Board's findings and, hence, its conclusion that Clark's license could be denied. We defer to an agency's findings of fact if they are supported by substantial evidence. Substantial evidence is relevant evidence that a reasonable mind can accept as adequate to support an agency's conclusion. *Colorado Interstate Gas Company v. Wyoming Department of Revenue*, 2001 WY 34 ¶ 8, 20 P.3d 528, ¶ 8.

■ [¶ 25] The Board found that Clark made a material misrepresentation[5] to the Board when he appeared before it on August 24, 1998. The material misrepresentation was "implying" that he had spoken directly with Gregg Fischer about service as a guide for Fischer when, in fact, he had not spoken directly to Fischer. No verbatim record of exactly what Clark said at that meeting is available, only the minutes of the meeting. The minutes make no mention of Clark's request to guide for Fischer. It is only through exhibits in the record that any information with respect to the request to guide

---

3. Section 23–2–414 states:

(a) Upon passage of required examination and if it determines the applicant is otherwise in compliance with the requirements of this act and its rules and regulations, the board may issue a license upon payment of the applicable fee as established by the board pursuant to W.S. 33–1–201.

(i) to (iii) Repealed by Laws 1998, ch. 59, § 2.

(b) A license issued under this act is valid for the calendar year in which issued and shall expire on December 31 of that year unless earlier expiring pursuant to W.S. 23–2–412(b) or otherwise suspended or revoked.

(c) A license may be renewed upon submission of application with the board in accordance with its rules and regulations and payment of the appropriate fee prescribed under subsection (a) of this section.

(d) All fees collected by the board pursuant to this act shall be deposited with the state treasurer. Upon receipt, the state treasurer shall credit the revenues to an account within the trust and agency fund. Expenditures from the account shall be for expenses incurred by the board in administering this act.

4. Section 16–3–113 states:

(a) When the grant, denial, suspension or renewal of a license is required by law to be preceded by notice and an opportunity for hearing the provisions of this act concerning contested cases apply.

(b) When a licensee has made timely and sufficient application for the renewal of a license or a new license with reference to any activity of a continuing nature, the existing license does not expire until the application has been finally determined by the agency, and, in case the application is denied or the terms of the new license limited, until the last day for seeking review of the agency order or a later date fixed by order of the reviewing court.

(c) No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. A cancellation of a driver's license pursuant to W.S. 31–7–121(c) shall not be valid until the department of transportation gives notice by mail to the licensee of the facts which warrant the intended action and provides the licensee with an opportunity to provide additional evidence or information with respect to the condition at issue within fifteen (15) days of the mailing of the notice. These proceedings shall be promptly instituted and determined.

5. Chapter 3, Section 1, subsection (a) of the Wyoming State Board of Outfitters and Professional Guides, Rules and Regulations, provides: "(a) A licensee shall not submit any materially false statements or fail to disclose any material facts requested in connection with an application for licensure."

for Fischer can be found. One is a notation that the request was denied, and the second is this line from a letter Clark wrote to the Board: "Also Mr. Gregg Fischer was interested in hiring me if he needs another guide this fall." Clark claimed he did not say that he had talked to Fischer but merely that he represented that he could work for Fischer if the Board would add that provision to his conditional license.[6] Clark testified that, although he had not talked with Fischer, he was informed through a third party that Fischer could use him as a guide if he was licensed. It is also Clark's contention that he never did ask to be licensed to work for Fischer but that he merely used him as an example of someone he could work for if his license was not so tightly conditioned. The only reliable evidence of what Clark said with respect to Fischer comes from Clark; indeed, it could be said that that is the only evidence in the record going to this issue. Based on the record, we cannot conclude that there was substantial evidence to support the Board's conclusions in this regard.

[¶ 26] The Board also found that Clark misrepresented facts and intentionally omitted other material facts with respect to the distance between Dale Clark's "camp" and the "camp" run by Amerine. Clark said they were about 28 miles apart. This is reflected in the minutes of the August 24, 1998 meeting. The factual basis for these alleged misrepresentations came in the form of testimony from Ranger Nyman. Nyman's testimony established that she differentiated between "camp" and "camp permit." She also differentiated between whether one was measuring the distance by hiking or going on horseback, as opposed to how the "crow flies." Nyman testified that the distance between the two camps was six or seven miles "from camp to ridge," and that the distance from "camp to day-use boundary is about 36 miles if you go on a road." Referring to the map that was used at the hearing, the distance from "camp" to "camp" appears to be

about 18.5 miles as the "crow flies." Nyman's testimony appears to go to the closest possible distance that Clark might have been to Amerine's camp. Clark's testimony appears to go to the distance between the two camps. The record does not reflect how close to the Amerine camp Clark actually did work. Our conclusion is, once again, that the record simply does not contain substantial evidence to support the Board's conclusion that Clark made a material misrepresentation (or omission) in this regard.

[¶ 27] Finally, the Board found that Clark, during a routine license check being made by Game and Fish Warden Hyde and Ranger Nyman, acted in such a manner as to intend to "harass and/or intimidate U.S. Forest Service and Wyoming Game and Fish officers." Further, the Board found that Clark's conduct that day constituted "unethical or dishonorable conduct .... for failing to cooperate with State and Federal wildlife officials."[7] We first note that Nyman's role on the day in question was that of observer, and she had no direct contact with Clark, and that Hyde was the individual executing the routine license check. One of Nyman's observations was that Clark became visibly angry during the check and that she observed one of Clark's horses stepping on Hyde's foot. Hyde testified that he stopped Clark and his two hunters to do license checks. In very close proximity were Hyde, Nyman, Clark, Clark's pick-up and horse trailer, two hunters, and three horses. Hyde could tell that Clark was angry, so he ignored Clark and approached the hunters to check their licenses. During this process, Clark was moving horses into the horse trailer, and Hyde could tell that Clark jerked on one horse's head. The horse "braced and threw his head up. And as he braced, his foot hit [Hyde's] foot. He didn't step on [Hyde's] foot, he just hit against the side of it and kind of moved it aside." Hyde could not say that Clark did it purposely but that he "cer-

---

6. Clark's testimony established that jobs as a guide often came up on very short notice, precluding Clark from having time to go to the Board for additional authority to work as a guide.

7. Chapter 3, Section 1, subsection (f) of the Wyoming State Board of Outfitters and Professional Guides, Rules and Regulations, provides: "(f) A licensee shall cooperate fully with private landowners and public land management agencies and shall respect their rights and privileges."

tainly was careless in coming that close." Hyde then asked Clark where he had been hunting, and Clark responded, "What do you want to know for?" Clark then walked to his pick-up and drove away. Hyde testified that, while he did view Clark as "disruptive and antagonistic," he did not think it warranted any enforcement action on his part. Clark presented a considerably different view of what transpired that day, and there was considerable evidence of a feud between Ranger Nyman and Clark.[8] However, we will base our resolution of this incident on the evidence noted above. We certainly do not condone Clark's contumacy, particularly as it was directed toward Ranger Nyman. However, the record reflects that Warden Hyde was the individual interacting with Clark on the day at issue. Clark's behavior, as described by Hyde, could not be characterized as "fully cooperative," but it is also clear that Hyde made a decision to desist in the routine check because he saw no further point in it. We are unable to view the totality of the circumstances described by the record as supporting the Board's conclusion that Clark violated applicable statutes or regulations to such an extent as to warrant denial of his 1999 license application.

[¶ 28]  For the reasons set out above, the district court's order reversing the Board's decision to deny Clark's 1999 guide's license application is affirmed.

---

8.  We do not dispute Ranger Nyman's contentions that she and Clark had more than one run in. However, to the extent Nyman described incidents directly between the two of them (as opposed to her role as observer in the company of Warden Hyde), they are matters more pertinent to another forum because they do not relate to Clark's activities as a guide.