2003 WY 40

The BOARD OF COUNTY COMMISSIONERS OF TETON COUNTY, Wyoming, Appellant (Plaintiff),

v.

Thomas L. CROW and Carol–Ann G. Crow, James E. Moeller and Southpac Trust International Inc., Trustees of the TLC/CGC Trust, Jeffrey S. Overton, Appellees (Defendants).

Thomas L. Crow, Appellant (Plaintiff),

v.

Board of County Commissioners of the County of Teton, Appellee (Defendant).

Nos. 01–244, 01–245.

Supreme Court of Wyoming.

March 26, 2003.

Stephen E. Weichman, Teton County & Prosecuting Attorney, and James L. Radda, Deputy Teton County Attorney, Jackson, WY, Representing Appellant Board of County Commissioners of Teton County. Argument by Mr. Radda.

Timothy Newcomb of Grant & Newcomb, Laramie, WY, and Katherine L. Mead of Mead & Mead, Jackson, WY, Representing Appellees Thomas L. Crow and Carol–Ann Crow. Argument by Mr. Newcomb and Ms. Mead.

David B. Hooper and Tom Glassberg of Hooper Law Offices, Riverton, WY, Representing Appellee Jeffrey S. Overton. Argument by Mr. Glassberg.

* Chief Justice at time of oral argument.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶ 1] The Board of County Commissioners of Teton County (Teton County) sought to enforce its Land Development Regulation (LDR or LDR's) which limits the size of a single-family residence to 8,000 square feet of habitable space. So as to clarify what follows, we include the pertinent portion of the text of that regulation here:

SECTION 2450. MAXIMUM SCALE OF DEVELOPMENT

A. **Residential Development.** Notwithstanding the development standards specified in Table 2400, *Schedule of Dimensional Limitations,* single-family development shall comply with the following standards:

1. **Habitable space.** The maximum amount of habitable space for a single family dwelling, including associated accessory structures, is 8,000 square feet.

2. **Total square footage.** The total floor area of a single family dwelling, including all associated accessory structures, shall not exceed 10,000 square feet.

3. **Basements excluded.** Basements, as defined in these Land Development Regulations, are excluded from the calculation of maximum scale of development. For the purposes of this section, only floor area above ground shall be counted. Floors above ground shall include partial levels such as lofts and interior balconies. (Amended 9/27/94) [Vol. 1, p. 106]

The LDR's at issue here, as well as Teton County's Comprehensive Plan, were adopted on May 9, 1994.

[¶ 2] Thomas and Carol–Ann Crow, and their trust (Crow), own a house in the Owl Creek Subdivision in Teton County. During 1997–98, Crow built a house, which conformed to the square footage limitation imposed by Teton County. The house was completed and approved as compliant with the applicable regulations on December 22, 1998. In January of 1999, with the assistance of a contractor, Jeffrey Overton (Over-

ton), Crow remodeled the house to expand its habitable square footage to about 11,000 square feet[1]. Teton County filed this action on April 21, 2000, to enforce the applicable regulations and to abate the violations that had taken place. Also on April 21, 2000, Crow filed a lawsuit seeking declaratory and injunctive relief, including a judicial declaration that portions of Teton County's LDR's were unconstitutional. As a part of its prayer for relief, Teton County sought an order which would require Crow and Overton to abate the violations "by any and all means necessary, including, but not limited to, the removal, destruction, and demolition of the unapproved addition to the Crow residence." The district court determined that enforcement of the applicable regulation, as applied to Crow under the facts of this case, violated his due process rights and thus granted summary judgment in Crow's favor. The effect of that decision required Teton County to abide the remodeling of the Crow residence. All three parties enumerated above have joined in this appeal.

[¶ 3] We will reverse the order of the district court and remand for further proceedings consistent with this opinion.

## ISSUES

[¶ 4] As appellant in Case No. 01–244, Teton County raises these issues:

1. Whether the district court erred a) in granting Crow's summary judgment motion on the basis that, as applied to the specific facts of this case, the enforcement of Section 2450 against Crow violates Crow's substantive due process rights, and b) in denying the County's summary judgment motion on the basis that, as applied to the specific facts of this case, the enforcement of section 2450 against Crow did not violate Crow's substantive due process rights?

2. Whether the district court erred in granting Crow's summary judgment motion concerning Count II of the County's complaint pertaining to development without a permit?

[¶ 5] As appellee in Case No. 01–244, Crow did not provide a summary of the issues, but we glean the following from the headings to Crow's arguments:

1. The district court was correct in ruling that, "as applied to the specific facts of this case", Section 2450 of Teton County's Land Development Regulations "in no way rationally relates to the County's objective of promoting and protecting the public health, safety, morals, and general welfare," and, therefore, violates the Crows' substantive due process rights.

2. The County's Land Development Regulations did not require the Crows to obtain a permit in order to make nonstructural changes to the interior of an existing, permitted and approved home.

3. The Crow home is grandfathered under the Board's established custom and usage, which permits other subdivision lots to build out according to the rules and regulations in place when the subdivision was approved and platted.

4. The Board's treatment of the Crows and the discriminatory intent of Section 2450 violates equal protection of the law under the United States and Wyoming Constitutions.

5. The County's Land Development Regulations were not promulgated in accord with applicable laws.

6. Teton County's Planning Director has impermissibly engaged in illegal rule making with respect to how "habitable space" is measured and the terms "habitable space" and "total floor area" are unconstitutionally vague and in violation of the 14th Amendment Due Process Clause and Art. 1, § 6 of the Wyoming Constitution.

7. Section 2450 constitutes a taking.

8. Section 2450 violates the Crows' unenumerated right to residential privacy.

---

1. Although the record is not entirely clear in this regard, it appears that the district court accepted that Crow's house had approximately 11,000 square feet of habitable space. It was evident in the proceedings below that Crow disputed this fact and that a resolution of this question is very material to the outcome of this case. On remand this factual issue must, of course, be resolved by the fact-finder.

9. Section 2450 violates the Crows' right to associate with their family under the 14th Amendment Due Process Clause and Art. 1, § 6 of the Wyoming Constitution.

[¶ 6] As appellant in Case No. 01–245, Crow states these issues:

I. Is the Board's regulation of "habitable space" and "total floor area" of homes—which are otherwise approved for safety, land use compatibility and aesthetics—in order to promote "community character, rural character, rural western character, land use and character type compatibility, social and economic diversity through housing affordability and social and economic diversity by lessening the demand on affordable housing," an exercise of power beyond that delegated to counties to regulate the location and use of buildings and use of lands in order to promote health, safety, morals or welfare, as required by W.S. § 18–5–201?

II. If "community character, rural character, rural western character, land use and character type compatibility, social and economic diversity through housing affordability and social and economic diversity by lessening the demand on affordable housing" are legitimate state interests as defined by W.S. § 18–5–201, does Section 2450 promote the public health, safety, morals or general welfare, as required by W.S. § 18–5–201?

[¶ 7] In response to the issues raised by Crow, Teton County restates the issues in Case No. 01–245 thus:

1. Whether Wyo. Stat. § 18–5–201 authorizes counties to regulate the height, bulk and scale of buildings?

2. Whether Section 2450 of the Teton County Land Development Regulations satisfies the requirements of substantive due process facially?

[¶ 8] Overton did not file a notice of appeal. However, he raises these issues as an appellee in Case No. 01–244:

Appellee Jeffery S. Overton incorporates herein all of the issues set forth in the brief of Appellee Thomas L. Crow and, in addition, the following issues which are unique to Appellee Overton:

1. When a plaintiff mistakenly files a lawsuit against an individual who was president of a corporation, rather than against the corporation itself, and the plaintiff fails to allege or to adduce any evidence that the individual or the corporation did or failed to do anything that relates to piercing the corporate veil, is the individual defendant entitled to dismissal as a matter of law?

2. Is a person who is not a "Developer" subject to the Teton County Land Development Regulations?

3. Can a person who is not a "Landowner" be made to abate alleged violations of the Teton County Land Development Regulations and be ordered to demolish real property which he does not own and which he does not have a legal right to enter?

4. Can a person who is not a "Landowner" be made to pay a per diem fine for alleged continuing violations of the Teton County Land Development Regulations when the person is legally incapable of remedying the violation in order to stop the fine from continuing to accumulate?

## FACTS

[¶ 9] On March 21, 1995, Crow appeared through counsel at a meeting of the Teton County Board of County Commissioners and requested permission to construct a house with 12,000 square feet of habitable space. Crow owned four contiguous lots in the Owl Creek subdivision and a portion of his argument was based upon a theory that since he could build four separate houses with 8,000 square feet of habitable space, then he should be permitted to build one house with the larger dimensions on two of the adjoining lots. The covenants that applied to the Owl Creek subdivision permitted such a building plan. The minutes of the Board of County Commissioners contain the following entry concerning the application:

3. A request from Peter Moyer for his client Tom Crow. Mr. Crow has two lots in Owl Creek. He would like to combine the two lots and build a 12,000 square foot

house. The Owl Creek covenants allow for this. However, the County does not deal with covenants and the County Plan only allows for an 8,000 square foot house. Bill Collins stated that Mr. Crow would need a Plan Amendment or a Variance. Peter stated that it comes down to whether it is grandfathered. Sandy stated that this was not grandfathered when the Plan was adopted.

So far as the record on appeal shows, Crow did not seek a plan amendment or a variance, nor did he further explore by administrative means whether or not his property was "grandfathered" so as not to be affected by the adoption of the 1994 LDR's.

[¶ 10] In April of 1996, Crow, acting through Overton, who is a general contractor, obtained a building permit to construct a house with approximately 8,000 square feet of habitable space, and 10,000 square feet overall, on Lot 36 (the permit was limited only to Lot 36 and did not relate to any of the other contiguous lots owned by Crow).

[¶ 11] Shortly after the house was completed in December of 1998, Crow appears to have added about 3,000 square feet of habitable living space by adding two bedrooms and three bathrooms under the existing vaulted roofs of two attached garages and the master bed/bath, as well as converting a porch to habitable space. It was Crow's contention that this work was done "for safety concerns, for purposes of heating efficiency and to accommodate the needs of his extended family." Crow contends that this work did not change the exterior or "footprint" of the house at all, although Teton County claims that to some small extent it did. It appears from some of the evidence in the record that the expansion of the Crow house was contemplated all along, but that the "Phase II" portion of the work was not begun until after the final inspection and approval of "Phase I" by Teton County, which was the initial 8,000 square feet of the house. The remodeling work was done by Overton without benefit of a building permit. Overton conceded that a permit was not sought because everyone knew one would not be granted.

[¶ 12] In addition to seeking demolition of the unauthorized additions to Crow's house, Teton County sought authority to inspect the structure in order to ensure compliance with applicable laws and rules and regulations. Teton County also seeks to collect the applicable fine of up to $750.00 per day for the entire time period at issue here (*i.e.*, early January of 1999 until present time). Crow raised a number of counterclaims, in particular, challenging the constitutionality of certain of Teton County's LDR's. Crow also filed a separate action seeking declaratory and injunctive relief. The two actions were consolidated.

[¶ 13] Crow articulated his "philosophy" with respect to the building, and then the expansion, of his Teton County house in this affidavit:

When Cally, my wife, and I were looking for the best possible place to build our retirement home, we decided upon Teton County from among many very desirable alternatives. We did so, in part, because of the relatively limited amount of land which could ever be developed, leaving most of Teton County in its natural state. It is very important to us to be able to reach [teach] our family, especially our grandchildren, the great value of associating with family and the importance and beauty of nature, especially as found in Teton County.

Among our many considerations in deciding where to retire was that we wanted to build a home, not only where we could spend our entire lives, but one that would be an especially attractive and suitable place for our entire family, including our children and particularly grandchildren. We knew we would have to compete for our children's and our grandchildren's time, so we wanted to build a home where they would want to come and bring their friends. Our approach has worked. We have been blessed and continue to be blessed with numerous visits. We are committed to teaching our family, especially our grandchildren, the incalculable importance of sense of family, of associating with one's family and of appreciating nature to a healthy and balanced life. We

wanted a home that could accommodate our extended family in a place where the beauty of nature is obvious and abundant. We wanted a place which would be consistent with encouraging those values and conducive to passing them along to our grandchildren, especially. We felt the need to make a place that would be so attractive that other demands on their time would be overcome. That approach demanded that we build a home of a certain size with sufficient bedrooms. Our approach would have the advantages that we would more likely see them more often, they would have exposure to those values that, for us, are among the most important in life, and incidentally, we would also get to know with whom they were consorting. We have been visiting the Jackson area since 1995. We are certain that Jackson Hole is the right place, and that our home is as it needs to be to accommodate our extended family and to attract our children and grandchildren in order to inculcate the values we believe they will need as they carry forth in their own lives.

**Governing Statutes**

[¶ 14]   The issues raised in these appeals must be considered in light of the authority that has been delegated to Teton County by the Wyoming Legislature with respect to planning and zoning. The legislature has granted broad power to counties to regulate the unincorporated lands within their respective jurisdictions.[2] *Ford v. Board of County Commissioners of Converse County,* 924 P.2d 91, 95 (Wyo.1996); *Snake River Venture v. Board of County Commissioners, Teton County,* 616 P.2d 744, 752–53 (Wyo.1980). The pertinent statutes are set out in their entirety in Appendix I.

**Teton County's Land Development Regulations**

[¶ 15]   We have already quoted Section 2450 on the first page of this opinion. We add here that habitable space is also defined by the LDR's:

**Habitable space.**   Habitable space means heated space used for living purposes. Heated storage areas, studios, exercise rooms, offices, and similar spaces are included as habitable space. Barns, garages, unfinished attic space and under floor spaces are not included in habitable space.

**STANDARD OF REVIEW**

[¶ 16]   The district court resolved this litigation on cross motions for summary judgment. We will set out here the key elements of the standard of review we apply to matters resolved by summary judgment. However, we deem it prudent to note at this early juncture that, while there are numerous disputed material facts at issue, the district court resolved the issues on purely legal and constitutional principles. Various portions of our decision will, of necessity, rely on standards of review more directly applicable to individual issues, and we will clarify the standard of review being applied as we go through those issues.

[¶ 17]   When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. *Reed v. Miles Land and Livestock Company,* 2001 WY 16, ¶ 9, 18 P.3d 1161, ¶ 9 (Wyo.2001). A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. *Scherer Construction, LLC v. Hedquist Construction, Inc.,* 2001 WY 23, ¶ 15, 18 P.3d 645, ¶ 15 (Wyo.

---

**2.**   Indeed, counties and other "agencies" of the state, as well as other enumerated governmental entities, may jointly formulate such plans. *See*

Wyo. Stat. Ann. §§ 16–1–101 through—110 (LexisNexis 2001).

2001). *Central Wyoming Medical Laboratory, LLC v. Medical Testing Lab, Inc.*, 2002 WY 47, ¶ 15, 43 P.3d. 121, ¶ 15 (Wyo.2002).

**Case No. 01–244**

[¶ 18] In Case No. 01–244, the district court's holding that Section 2450 is unconstitutional as applied to Crow is at issue, and we must also address Crow's assertion that the district court erred in holding that it is facially constitutional.

### Standard of Review

**LDR's as Facially Unconstitutional**

[¶ 19] We have had occasion to discuss this area of the law in some detail. Although that occasion was some 17 years ago, little that we had to say then has changed in the ensuing years. In a discussion of the police power vested in local governments we held:

Both the United States Constitution and the Wyoming Constitution impose due process limitations on exercises of the police powers. The Fifth and Fourteenth Amendments to the United States Constitution and Art. 1, § 6 of the Wyoming Constitution all assert that no person shall be deprived of life, liberty or property without due process of law. In general, Wyoming has, in zoning cases, interpreted its due process provision in a manner parallel to the federal provisions. *See e.g. Board of County Commissioners of Teton County v. Teton County Youth Services, Inc.*, Wyo., 652 P.2d 400, 414 (1982).

The due process clause has both a procedural and a substantive aspect. *State v. Langley*, 53 Wyo. 332, 84 P.2d 767 (1938). In the case at bar the trial court declared that Cheyenne's airport zoning ordinance failed to meet constitutional standards of substantive due process. For the reasons that follow, we cannot agree with this conclusion.

The constitutional standard of substantive due process, under both United States and Wyoming interpretations, demands that a police power regulation must promote a legitimate public objective with reasonable means. The substantive due process standard of reasonableness is applicable during the initial legislative process and theoretically confines the legislators. The judiciary may, in the context of an actual case, be called on to measure the legislative performance against the constitutional standard. When the legislative enactment lies in the economic and social welfare area, and when there are no suspect criteria or fundamental interests involved, the court will, in testing the enactment, inquire only as to whether the regulation is of debatable reasonableness. In other words, if the court perceives that the legislature had some arguable basis for choosing the end and the means, it will sustain the regulation at least as to compliance with substantive due process. Only when a regulation amounts to an arbitrary deprivation of regulatees' property will it be deemed to violate the dictates of substantive due process. As we said in *Washakie County School District No. One v. Herschler*, Wyo., 606 P.2d 310, 333 (1980), cert. denied 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28:

"When an ordinary [nonfundamental constitutional] interest is involved, then a court merely examines to determine whether there is a rational relationship between a classification * * * and a legitimate state objective."

In the present case the appellees sought, and the trial court apparently granted, a declaration of the ordinance's general or facial invalidity under substantive due process. We conclude, for reasons that follow, that the ordinance does comply with the requirements of substantive due process and that the trial court's contrary conclusion is erroneous.

The legitimate objectives of the police power are loosely characterized as being public in nature and the potential range is very broad. See *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984); *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). There is no real dispute in this case that the objectives of the Cheyenne airport zoning ordinance are both public and legitimate. The trial judge, in fact, stated:

"I think there is no question here that private property is sought for the public's good and safety * * *."

As to the means chosen by the Cheyenne council to achieve these objectives, we reiterate that, in the economic and social welfare area and when the ordinance is examined in a general, facial manner, the courts will usually go no further than to ascertain the debatable reasonableness of the legislative choices. *See Snake River Venture v. Board of County Commissioners, Teton County,* Wyo., 616 P.2d 744, 753 (1980). The United States Supreme Court, in dealing with general, facial challenges to local exercises of police power, has sustained the substantive due process reasonableness of a number of facets of local zoning. Thus, in *Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016 (1926), the Court determined that in a general sense, it is constitutionally reasonable and in accord with substantive due process for a local legislature to use comprehensive zoning and its uncompensated restrictions on use and bulk in order to promote the health, safety, morals, and general welfare. In *Gorieb v. Fox,* 274 U.S. 603, 47 S.Ct. 675, 71 L.Ed. 1228, 53 A.L.R. 1210 (1927), the Court upheld the general reasonableness of zoning setbacks and their requirement that portions of plots be left unbuilt. In *Goldblatt v. Town of Hempstead,* New York, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), the Court upheld the general reasonableness of local zoning restrictions on excavations below the depth of the water table. In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court sustained the general constitutionality of height limitations that New York City had imposed to protect historic and aesthetic landmarks. *See also Welch v. Swasey,* 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923 (1909).

These Supreme Court precedents do not address the specific issues of airport zoning and its general validity under the standards of substantive due process. We note, however, that they do deal with zoning provisions and restraints on the portions of property that can be physically used. Thus, the United States Supreme Court has sustained the general constitutional reasonableness of restrictions on the depth of activities in the subsoil (*Goldblatt v. Town of Hempstead, New York,* supra), the lateral extent of activities on the surface (*Gorieb v. Fox,* supra, and *Village of Euclid, Ohio v. Ambler Realty Co.,* supra), and the height of activities in the airspace (*Penn Central Transportation Co. v. City of New York,* supra). We hold, therefore, that to the extent that the lower court in the present case purported to enjoin airport zoning in general as contrary to the demands of substantive due process, it was in error.

Substantive due process, with its emphasis on legitimate objectives and rational means, can be explored and applied in a general sense when the reasonableness of the entire ordinance or statute is in question. *See e.g. Village of Euclid, Ohio v. Ambler Realty Co.,* supra. It can also be examined in a specific sense, when the court evaluates the reasonableness of a law as applied to an individual. *See Nectow v. City of Cambridge,* 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842 (1928).

*Cheyenne Airport Board v. Rogers,* 707 P.2d 717, 726–28 (Wyo.1985).

■ [¶ 20] Crow contends that, on its face, Section 2450 is not a rational or reasonable exercise of Teton County's police powers. The regulations put in place by Teton County resemble those of many other jurisdictions and, on the face of things, they appear to be both rational and reasonable:

The courts have recognized this role of planning, in defining planning as concerned with "... the physical development of the community and its environs in relation to its social and economic well-being for the fulfillment of the rightful common destiny, according to a 'master plan' based on 'careful and comprehensive surveys and studies of present conditions and the prospects of future growth of the municipality,' and embodying scientific teachings and creative experience."

Donald G. Hagman and Julian Conrad Juergensmeyer, *Urban Planning and Land Development Control Law,* § 2.10 at 26 (1986) (*citing Angermeier v. Borough of Sea Girt,* 27 N.J. 298, 142 A.2d 624, 629 (1958)).

[¶ 21] Teton County is an area of extremely rare natural beauty, and Crow acknowledges that magnificence. In addition to protecting the beauty of the valley, we note that Teton County might well wish to address the preservation of its colorful and storied past, as well as the impact that the construction, maintenance and servicing of large homes might have on the microeconomics of Teton County. Crow fails in his efforts to cogently argue that the regulations lack a reasonably conceivable rational basis, and by the measuring stick identified in *Rogers,* as well as the great body of pertinent authority available on this subject, the regulations are, indeed, rational and that rationality is readily perceptible. *See, e.g., Crider v. Board of County Commissioners of the County of Boulder,* 246 F.3d 1285, 1289–90 (10th Cir. 2001); *Bannum, Inc. v. City of Fort Lauderdale, Florida,* 157 F.3d 819, 822–24 (11th Cir.1998); and *WMX Technologies, Inc. v. Gasconade County, Missouri,* 105 F.3d 1195, 1198–1201 (8th Cir.1997).

[¶ 22] We hold that the regulations at issue here are not facially unconstitutional.

**LDR's as Violation of Substantive Due Process as Applied**

[¶ 23] The district court granted Crow's motion for summary judgment on the basis that, as applied to the circumstances of this case, Section 2450 was unconstitutional as applied to Crow. The district court recited many of the undisputed factual matters set out above but also made the finding that Crow "later added some interior flooring for heating and safety concerns." The district court also took note that Crow's home did not change "from outside." "The changes were only to the interior of [Crow's] home." It is apparent from the record that these facts were very much in dispute. The district court findings also included these:

10. Section 2450 promotes the legitimate public objectives of protecting, promoting, and preserving (1) community character, (2) rural character, (3) rural western character, (4) land use and character type compatibility, (5) social and economic diversity through housing affordability, and (6) social and economic diversity by lessening the demand on affordable housing.

11. Other subdivisions, specifically Teton Pines, have been allowed to build houses in excess of Section 2450's limitations.

12. [Crow] uses his residence solely for a family residence.

13. [Crow] has a large immediate and extended family.

14. [Crow] owns and built this residence on four contiguous lots.

15. If developed individually, each lot could contain a residence of 8,000 square feet of habitable space, and 10,000 square feet of total floor area.

[¶ 24] The district court then reached these conclusions:

Substantive due process in zoning requires that a regulation promote a legitimate public objective through rational means. *Cheyenne Airport Bd. v. Rogers,* 707 P.2d 717, 723[727] (Wyo.1985). A substantive due process claim can be examined in a specific sense when the court evaluates the reasonableness of a law as applied to an individual. *Id.* at 728.

The addition of second story floor area within a completed residence in no way altered the aesthetics of the residence. Therefore, enforcement of Section 2450 against [Crow] does not promote the aesthetic concerns of protecting, promoting, and preserving community character, rural character, or rural western character.

The addition of second story floor area within a completed residence in no way altered [Crow's] exclusive use of the structure as a residence for his large family. Therefore, enforcement of Section 2450 against [Crow] does not protect, promote, or preserve land use compatibility or character type compatibility.

The addition of second story floor area within a completed residence in no way affects social and economic diversity. [Crow's] residence has the same impact on

housing affordability with or without the additional flooring. Similarly, [Crow's] residence has the same impact on the demand for affordable housing with or without the additional flooring.

As applied to the specific facts of this case, this Court concludes that the enforcement of Section 2450 of the LDR's against [Crow] in no way rationally relates to the County's objective of promoting and protecting the public health, safety, morals, and general welfare. Therefore, as applied to the specific undisputed facts in this case, Section 2450 violates [Crow's] substantive due process rights.

We also note at this juncture that the district court appears to have granted summary judgment in favor of Overton on the basis that its resolution of Crow's due process issue rendered any further action against Overton moot. That would not necessarily be the case, and we cannot accept that rationale.

[¶ 25] Teton County contends that the district court erred in concluding, as a matter of law and based upon disputed facts, that Section 2450 was unconstitutional as applied to Crow. The gist of this conclusion is that, from the outside, Crow's house looks exactly the same with 11,000 square feet of habitable space in it as it did with only 8,000 square feet of habitable space in it and, therefore, there is no rhyme or reason to Teton County's regulations in this regard. We do not agree. Teton County articulated its rationale in detail, which we will set out below. In treating the question of unconstitutionality of a statute, we impose a severe burden upon the challenger. Crow must establish that the statute is unconstitutional beyond a reasonable doubt, and any fact that can be rationally conceived to sustain the statute is to be assumed. Crow is required to clearly and exactly show the unconstitutionality beyond any reasonable doubt. *Board of County Commissioners v. Geringer,* 941 P.2d 742, 746 (Wyo.1997); and *see Reiter v. State,* 2001 WY 116, ¶ 7, 36 P.3d 586, ¶ 7 (Wyo.2001); *see generally* Hagman and Juergensmeyer, *Urban Planning and Land Development Control Law,* Chapter 10.

[¶ 26] Crow's argument, which the district court accepted, that the square footage limitation was only aimed at the "envelope," "foot print," and/or "bulk" of the house, is incorrect. Put another way, Crow argues that it is of no legitimate or reasonable concern to Teton County what the interior space of his house is like, so long as the exterior does not offend any regulation. Once again, we do not agree. We will begin our discussion with the very basics. Teton County chose to address the broad range of concerns and problems it faced with burgeoning development, in an area of unique natural beauty and the availability of only a very limited amount of privately-owned land, by adopting a comprehensive planning and zoning ordinance. All parties to this litigation agree that Teton County is unique in many ways and certainly is one of only a handful of areas on earth with such an abundance of natural amenities. Teton County chose as one tool in its arsenal of weapons to prevent the destruction of those natural amenities a limitation on the square footage of new homes to 8,000 square feet of habitable space. It might have opted for 5,000 square feet or it might have chosen 15,000 square feet, but it picked 8,000. A limitation of some sort is, without need of further justification, rational. Indeed, the property in question is also burdened with private limitations that prohibited the building of residences that were either too small or too big. Such private limitations, which usually take the form of covenants that run with the land, serve rational and legitimate purposes. In any event, we must give recognition to the fact that a limiting number of some sort is by its very nature reasonable in virtually any context, and, as will be shown from Teton County's planning process, painstaking thought went into selecting the "number." Clearly, the number chosen provides for what can only be described as a house of commodious proportions, though it clearly does limit all persons' leave to build a single family dwelling of such proportions that it can accommodate multiple generations of families or, for that matter, groups of unrelated individuals which might exceed the capacity of an 8,000 square foot house. Teton County intended that its regulations have such an effect, and we are con-

vinced that a legitimate and rational purpose motivated the regulations. Among these rational and legitimate purposes are: (1) preserving community character; (2) preserving rural and western character; (3) promoting land use compatibility; (4) promoting housing affordability; and (5) mitigating against an unworkable increase in the number of low wage employees needed to provide services to, and maintain, large homes thereby lessening the demand for affordable housing in an area where affordable housing was scarce and getting scarcer.

[¶ 27] Bill Collins, the Planning Director for Teton County, provided the evidence which is central to the resolution of this case in the form of an affidavit. We have set out the content of that affidavit in detail in Appendix II.

[¶ 28] Teton County also did considerable research in describing what it called its "Community Vision," and it is evident that both Collins' affidavit and the "Community Vision" statement were based upon a close study and complete inventory of all structures located in Teton County that predated the proliferation of large vacation homes. The "Community Vision" statement adds considerable information that is important to the analysis of this issue. We have set it out in detail in Appendix III.

[¶ 29] Despite his strenuous criticism of Teton County's evidentiary materials, Crow presented no evidence which rebutted them even though he had the burden of proof. Moreover, Teton County's conclusion that limitations on habitable space would have a salutary effect on the need for, as well as the availability of, affordable housing is supported by a study done by Pitkin County, Aspen, Colorado. We are convinced that the Teton County LDR's are a rational, reasonable, and legitimate exercise of Teton County's police powers with respect to zoning and development. Moreover, the evidentiary materials, when read in a light most favorable to Teton County, are virtually uncontradicted in establishing that Crow built an 8,000 square foot house with cathedral ceilings over the garages and other areas for the purpose of evading the limitations imposed by the Teton County LDR's. We hold that the district court erred in entering summary judgment in favor of Crow on the basis that, as applied to his specific case, the LDR's were a violation of Crow's due process rights.

**Did the District Court Err in Granting Summary Judgment with Respect to Teton County's Allegations of Development without a Permit**

[¶ 30] In addition to seeking an order requiring Crow to abate the violation (which may include removal, demolition and destruction of the excess habitable space), Teton County asked that the district court impose sanctions of a criminal nature (fines), as authorized by Wyo. Stat. Ann. §§ 18–5–204, 205, and 206. The district court apparently concluded that those issues were rendered moot by its determination that the LDR's were unconstitutional as applied. The Teton County regulations provide as follows in this regard:

> **Development.** Development means any of the following activities for which permission may be required pursuant to these Land Development Regulations: ... (b) the construction, reconstruction, conversion, structural alteration, relocation, or enlargement of any buildings, structures, or accessory structures[.]

The regulations go on to clarify that a "development permit" includes a "building permit," and that "structural alteration" means "any change in the supporting members of a building or structure, such as the bearing walls, beams, or girders, or any change in the dimension or configuration of the roof or exterior walls." Teton County issues building permits under the Uniform Building Code, Section 106.1, which provides:

> Except as specified in Section 106.2, no building or structure regulated by this code shall be erected, constructed, enlarged, altered, repaired, moved, improved, removed, converted or demolished unless a separate permit for each building or structure has first been obtained from the building official. [932]

[¶ 31] Even if a court were to conclude that the excess habitable space need not necessarily be demolished, or that the regu-

lations as applied were unconstitutional (and we have found they are not), it was a question for a fact-finder to determine whether or not Crow violated the above-enumerated statutes and what penalty should be imposed.

[¶ 32] We agree with Teton County that it was an oversight for the district court to have failed to consider this aspect of the complaint. Upon remand it must be resolved.

**Other Grounds for Affirmance Addressed by Crow in Response to Teton County's Appeal in Case No. 01–244**

[¶ 33] Crow contends that there are numerous bases upon which this Court can affirm the summary judgment, even if this Court rejects the district court's determination that the LDR's are unconstitutional as applied to Crow. As a preface to our discussion of the issues raised by Crow, we refer back to our standard of review for summary judgment and, in particular, that portion which dictates that we examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. We note at the outset that Crow presents the facts in a light most favorable to his viewpoint and fails to take into account those facts favorable to Teton County's position.

[¶ 34] Crow contends that what he did to his home did not require him to obtain a permit because the changes were not "structural" in nature. The district court made no findings in this regard. It appears that this issue was merely set aside once the district court determined that the LDR's were unconstitutional as applied to Crow. It is evident both from the record and from the briefs that whether or not Crow was obligated to obtain a permit is a disputed question, both as a matter of fact and as a matter of law.

[¶ 35] Crow also claims that his lot(s) were grandfathered in under old regulations, which preceded the LDR's at issue here. The record extant simply does not support such an argument, although, of course, that issue will likely have to be further addressed

by the district court on remand. However, at this juncture we again note that the record appears to support a conclusion that Crow advanced this argument to the Teton County's Planning Officer and was rebuffed. Upon being rebuffed, that issue was not further pursued by Crow until this stage of the proceedings. Having failed to establish that the property was grandfathered and having failed to pursue any administrative or legal remedies prior to having the house built, the district court may be compelled to determine that he may not now raise that issue. *See* Hagman and Juergensmeyer, *Urban Planning and Land Development Control Law,* § 23.4, at 780–81. In any event, detailed findings of fact and conclusions of law will be required.

[¶ 36] Crow contends that the LDR's violate his rights to equal protection of the law, that Section 2450 constitutes a taking, that it violates Crow's "unenumerated rights" to "residential privacy," and that it violates Crow's right to "associate" with his family. These contentions are not supported by pertinent authority nor cogent argument, and they were not considered or decided by the district court below. For these reasons we decline to consider them further. *GGV v. JLR,* 2002 WY 19, ¶ 20, 39 P.3d 1066, ¶ 20 (Wyo.2002); *Garnick v. Teton County School District No. 1,* 2002 WY 18, ¶ 37, 39 P.3d 1034, ¶ 37 (Wyo.2002); *Shumway v. Worthey,* 2001 WY 130, ¶ 9, 37 P.3d 361, ¶ 9 (Wyo. 2001).

[¶ 37] Crow further contends that the LDR's were not promulgated in accordance with applicable law and that Teton County has engaged in "illegal" rule-making. These issues were not considered by the district court in any meaningful sense, and we will not consider them further.

**Case No. 01–245**

[¶ 38] In his cross-appeal, Crow contends that the methods used by Teton County to control and limit development are an exercise of power beyond that delegated to Teton County by Wyo. Stat. Ann. § 18–5–201. In addition, he contends that to the extent this Court might determine that the

LDR's are within the power granted to Teton County by the legislature, those LDR's do not serve to promote the public health, morals, or general welfare, as required by § 18–5–201.

[¶ 39] Crow's argument goes like this: Some "permanent residents" stereotyped newcomers to Teton County as "wealthy/affluent non-residents" who were causing land values to skyrocket. Furthermore, Crow characterizes Teton County's efforts to channel and control development as discrimination and exhibiting an "animus" for "wealthy non-residents." Crow also contends that the LDR's are founded by a belief in the minds of "permanent residents" that the "very affluent" or those "with extensive families" have no part in Teton County's "community fabric." Crow also contends that others had violated the LDR's and either were not prosecuted or were given a slap on the hand and, therefore, nothing should be done to him or, at most, he should be slapped on the hand. Crow also contends that the existing structure was inadequate to house his "extensive" family, that there were heating problems, and ominous safety problems for the grandchildren, and that the only apparent means to remedy those problems was to expand the "habitable space" in the home by 3,000 square feet. After presenting this version of the case, Crow concludes that it is a single paragraph in the district court's judgment that brings him to this Court, and that is the district court's finding that:

10. Section 2450 promotes the legitimate public objectives of protecting, promoting and preserving (1) community character, (2) rural character, (3) rural western character, (4) land use and character type compatibility, (5) social and economic diversity through housing affordability, and (6) social and economic diversity by lessening the demands on affordable housing.

[¶ 40] We have held elsewhere in this opinion that the Teton County LDR's do not violate Crow's constitutional rights to due process either facially or as applied. We are now called upon to address Crow's claim that Teton County lacked the requisite statutory authority to adopt the LDR's in dispute.

We, of course, must construe Wyo. Stat. Ann. § 18–5–201 in accordance with our standards applicable to statutory construction:

In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is *de novo.* We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia. Wyoming Board of Outfitters and Professional Guides v. Clark,* 2001 WY 78, ¶ 12, 30 P.3d 36, ¶ 12 (2001).

*Allsop v. Cheyenne Newspapers, Inc.,* 2002 WY 22, ¶ 9, 39 P.3d 1092, ¶ 9 (Wyo.2002).

Our standard of review with respect to the construction of statutes is well known. In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed in *pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia.* When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. *Wyoming Board of Outfitters and Professional Guides v. Clark,* 2001 WY 78, ¶ 12, 30 P.3d 36, ¶ 12 (Wyo.2001); *Murphy v. State Canvassing Board,* 12 P.3d 677, 679 (Wyo. 2000). Moreover, we must not give a stat-

ute a meaning that will nullify its operation if it is susceptible of another interpretation. *Billis v. State,* 800 P.2d 401, 413 (Wyo.1990) (citing *McGuire v. McGuire,* 608 P.2d 1278, 1283 (Wyo.1980)). *Shumway v. Worthey,* 2001 WY 130, ¶ 8, 37 P.3d 361, ¶ 8 (Wyo.2001).

[¶ 41] Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions. *Gray v. Stratton Real Estate,* 2001 WY 125, ¶ 5, 36 P.3d 1127, ¶ 5 (Wyo. 2001); *Bowen v. State, Wyoming Real Estate Commission,* 900 P.2d 1140, 1143 (Wyo.1995).

[¶ 42] Crow states a conclusion that the LDR's do not fall within the authority delegated to Teton County, but we are unable to perceive a cogent argument or find pertinent authority which supports that supposition. The statute confers on Teton County broad authority to shape its destiny, control its growth, and determine how best to promote the health, safety, morals, and general welfare of its citizens. Crow's view is one to be pursued at the ballot box and not in the courtroom. The word "welfare" has as its meaning in the context of this statute: "the state of faring or doing well: thriving or successful progress in life: a state characterized esp. by good fortune, happiness, well-being, or prosperity." Webster's Third New International Dictionary, 2594 (1986). Teton County's choice of the word "character" in conjunction with the words "rural" and "western" connotes something that we think is quite clear, especially given Teton County's documentation of its plan. "Character," in this context means: "main or essential nature esp. as strongly marked and serving to distinguish: individual composite of salient traits, consequential characteristics, features giving distinctive tone (each town came to have a character of its own—Sherwood Anderson)." Webster's Third New International Dictionary, 376. Indeed, preserving "community character" is at the very heart of zoning and planning legislation. Hagman and Juergensmeyer, *Urban Planning and Land Development Control Law,* § 3.16, at 62–63. We hold that Teton County's decision to preserve its community character served the welfare of the people of Teton County

and is within the delegation of the authority granted it by Wyo. Stat. Ann. § 18–5–201.

[¶ 43] Crow contends that the LDR's violate the privacy of his home. For this proposition he cites *United States v. Orito,* 413 U.S. 139, 140–43, 93 S.Ct. 2674, 2676–77, 37 L.Ed.2d 513 (1973), in which the United States Supreme Court held that the constitutional zone of privacy with respect to pornographic materials does not extend beyond the home. No such invasion of the privacy of the home is at risk in this case. In all other respects, cogent argument or pertinent authority does not support this argument, and we will not consider it further.

[¶ 44] Crow contends that Wyo. Stat. Ann. § 18–5–201 does not authorize Teton County to regulate buildings with respect to size or bulk, *i.e.,* "habitable space," etc. Teton County has the authority to restrict the "location" of buildings. Buildings are located in three dimensions—length, width, and height. Included within the power to limit the location, is the authority to place limitations on bulk, including square footage. Moreover, this contention is not supported by pertinent authority.

[¶ 45] Crow contends that Teton County may not seek to promote or preserve "community character, rural western character, land use and character type compatibility, social and economic diversity through housing affordability, and social and economic diversity by lessening the demand on affordable housing," as these things have nothing to do with the "health, safety, morals and general welfare" of the people of Teton County. In support of this argument, Crow cites *Kindler v. Anderson,* 433 P.2d 268, 271 (Wyo.1967), where we said that covenants or other restrictive conditions placed in a deed to property, "... being in derogation of the common law, are not favored, are to be strictly construed, will not be extended by implication, and in case of doubt the restrictions will be construed in favor of the free use of land.... Nevertheless, if the language imposing the restrictions is clear and unambiguous the rule of strict construction does not apply." The result in that case was that the plaintiffs were permitted, because of the

presence of ambiguity in the covenants, to use the premises for dispensing intoxicating spirits. That case has no application whatsoever to the circumstances of this case. Crow characterizes the LDR's adopted by Teton County as being a "social agenda," "a permissive platform," "invasive of peoples' 'natural and civil rights,'" "spiritual," "aesthetic," related only to "beauty," "health," "spaciousness," "cleanliness," and a "well balanced" and "carefully patrolled" environment.[3] Such things, Crow argues, are only within the power of the State and have not been delegated to Teton County. We disagree. We hold that the LDR's at issue do not exceed the authority delegated to Teton County to ensure the general "welfare" of the people of that county.

[¶ 46] Finally, Crow contends that, even if all those standards like "community character," "rural character," "rural western character," etc. are legitimate state interests which Teton County has the authority to adopt, they are not promoted by Section 2450 and, therefore, this Court should declare them to be invalid.

[¶ 47] In support of this proposition, Crow relies on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). In the *Daubert* case, the Supreme Court of the United States opined:

Faced with the proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to [Fed. R. Ev.] Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

The Court did not set out a detailed methodology to be used by judges in making such an assessment but pointed to salient features of such an analysis, which included: Whether the scientific theory can be (and has been) tested, whether the theory has been subject-ed to peer review and publication, the known or potential rate of error, and "general acceptance" within the applicable scientific community. Crow contends that Teton County cannot rely on its own studies or those done by a sister resort with very similar "characteristics," Pitkin County, Aspen, Colorado. Crow's argument continues that it must be assumed the trial court relied on those materials, and since there is no credible evidence in the record to support a conclusion that Teton County's regulations promote the "general welfare" of the citizens of Teton County, then this Court may not rely upon any of those materials to approve of Teton County's LDR's. There are several leaps in logic in this argument, and we decline to make them. It is not clear what consideration the district court gave to any of the evidentiary materials in the record that have pertinence to resolution of the issues at large. It is not clear that the *Daubert* case has any relevance at all in these circumstances. The issue appears to be more in the nature of whether or not Teton County may justifiably rely on the experiences of a county like Pitkin County in deciding or further evaluating critical issues about development. It seems almost unquestionable that relying upon the experiences of a sister resort city would be solomonic on the part of the people of Teton County rather than unreasonable, as suggested by Crow. However, these are bridges that must be crossed as they present themselves in further proceedings before the district court which must give plenary consideration to the issues presented by the parties. As noted above, in those proceedings, Crow must carry the burden of proof that the regulations have no rational basis and are, therefore, unconstitutional.

### Issues Raised by Overton

[¶ 48] Overton asks that this Court decide a number of questions that have not yet been addressed by the district court. For instance, Overton contends that the district court should have dismissed the claims against him because the complaint named him rather than his corporation as defendant, and that he is neither a developer nor a

---

3. *See Berman v. Parker,* 348 U.S. 26, 32–33, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954).

landowner so he cannot be subject to the LDR's nor can he be made to demolish something that belongs to someone else. Curiously, Overton purports to adopt by reference all issues and arguments briefed by Crow. In many, if not most, circumstances such incorporation by reference may require this Court to ignore issues raised in such a manner. Each party to an appeal is required to submit a brief. Moreover, here it appears that Overton has no interest in any of the issues briefed by Crow. Perhaps, Overton intended that he would like to appear here in the role of an amicus curiae, but Overton did not make such a request, and we have granted no leave in that regard. The LDR's have not been applied to him, as they were to Crow, and Crow's other arguments essentially seek to vindicate rights personal to Crow. Finally, we note that Overton did not file a notice of appeal and, on that basis alone, we cannot consider the issues he raises in his brief. However, Overton is "saved," so to speak, because the district court did not purport to address any of Overton's defenses or to otherwise adjudicate any of the claims against him. Upon remand, it will be necessary for the district court to give plenary consideration to those issues as well as the others identified more fully above.

## CONCLUSION

[¶ 49] The order granting summary judgment is reversed in all respects, and the matter is remanded to the district court for further proceedings consistent with this opinion.

## APPENDIX I

**§ 18–5–201. Authority vested in board of county commissioners; inapplicability of chapter to incorporated cities and towns and mineral resources.**

To promote the public health, safety, morals and general welfare of the county, each board of county commissioners may regulate and restrict the location and use of buildings and structures and the use, condition of use or occupancy of lands for residence, recreation, agriculture, industry, commerce, public use and other purposes in the unincorporated area of the county. However, nothing in W.S. 18–5–201 through 18–5–207 shall be construed to contravene any zoning authority of any incorporated city or town and no zoning resolution or plan shall prevent any use or occupancy reasonably necessary to the extraction or production of the mineral resources in or under any lands subject thereto.

**§ 18–5–202. Planning and zoning commission; composition; residency requirements, terms and removal of members; vacancies; rules; record; meetings to be public; secretary; preparation and amendments; purpose; certifications and hearing; amendments.**

(a) Each board of county commissioners may by resolution create and establish a planning and zoning commission. The commission shall be composed of five (5) members appointed by the board at least three (3) of whom shall reside in the unincorporated area of the county, provided that this provision shall not affect the membership composition of any existing commission. The terms of the members appointed to the first planning and zoning commission shall be of such length and so arranged that the terms of one (1) member will expire each year, and thereafter each member shall be appointed for a term of three (3) years. Any member of the commission may be removed for cause other than politics or religion and after public hearing by the board of county commissioners. If a vacancy occurs in the commission the board of county commissioners shall fill the vacancy by appointment for the unexpired term. The planning and zoning commission shall organize within thirty (30) days after its establishment, shall adopt rules for the transaction of its business and keep a record of its actions and determinations. Three (3) members shall constitute a quorum for the transaction of business. All meetings, records and accounts of the commission shall be public. The county clerk shall serve as secretary to the commission.

(b) The planning and zoning commission may prepare and amend a comprehensive plan including zoning for promoting the public health, safety, morals and general welfare of the unincorporated areas of the county,

and certify the plan to the board of county commissioners. Before certifying its plan or amendments thereto to the board the commission shall hold at least one (1) public hearing. Notice of the time and place of hearing shall be given by one (1) publication in a newspaper of general circulation in the county at least thirty (30) days before the date of the hearing. Any person may petition the planning and zoning commission to amend any zoning plan adopted under the provisions of W.S. 18–5–201 through 18–5–207.

(c) The planning and zoning commission shall prepare recommendations to effectuate the planning and zoning purposes and certify its recommendations to the board of county commissioners. Before adopting the recommendations the board shall hold at least one (1) public hearing. Notice of the time and place of hearing shall be given by one (1) publication in a newspaper of general circulation in the county at least fourteen (14) days before the date of the hearing. After public hearing has been held, the board shall vote upon the adoption of the planning or zoning recommendation. No planning or zoning recommendation shall be adopted unless a majority of the board votes in favor thereof.

### § 18–5–203. Certificate required to locate buildings or use land within zoning resolution; issuance and denial; appeal upon denial.

It is unlawful to locate, erect, construct, reconstruct, enlarge, change, maintain or use any building or use any land within any area included in a zoning resolution without first obtaining a zoning certificate from the board of county commissioners and no zoning certificate shall be issued unless the plans for the proposed building, structure or use fully comply with the zoning regulations then in effect. The board of county commissioners shall act promptly upon any application filed with it and shall grant certificates when the proposed construction or use complies with the requirements of the zoning resolution. If it denies the application, the board shall specify the reasons for such denial. The decision of the board of county commissioners may be reviewed by the district court and

by the supreme court upon appeal in the same manner as provided in W.S. 15–626 [§ 15–1–609], for review of decisions of boards of adjustment.

### § 18–5–204. Violation of W.S. 18–5–202(c); continuing violation.

No person shall locate, erect, construct, reconstruct, enlarge, change, maintain or use any building or use any land in violation of a resolution or amendment adopted by any board of county commissioners under W.S. 18–5–202(c). Each day's continuation of such violation is a separate offense.

### § 18–5–205. Enforcement of zoning resolution by injunction, mandamus or abatement; appeal.

Any zoning resolution passed by the board pursuant to W.S. 18–5–202(b) and (c) is enforceable in addition to other remedies provided by law by injunction, mandamus or abatement.

### § 18–5–206. Penalty for violation of W.S. 18–5–201 through 18–5–204.

Whoever violates any provision of W.S. 18–5–201 through 18–5–204 shall be fined not more than seven hundred fifty dollars ($750.00) for each offense.

### § 18–5–207. Continuation of existing uses; effect of alteration or addition; future use after discontinuation of nonconforming use.

A zoning resolution enacted under the provisions of W.S. 18–5–201 through 18–5–206 shall not prohibit the continuance of the use of any land, building or structure for the purpose for which the land, building or structure is used at the time the resolution is adopted and it is not necessary to secure any certificate permitting such continuance. However the alteration or addition to any existing building or structure for the purpose of effecting any change in use may be regulated or prohibited by zoning resolution. If a nonconforming use is discontinued any future use of such land, building or structure shall be in conformity with the provisions of the resolution regulating uses in the area in which the land, building or structure is located.

§ 18-5-208. **Coordination of planning efforts with federal agencies.**

The board of county commissioners of a county which has officially adopted a comprehensive plan pursuant to W.S. 18-5-202(b) may participate in efforts to coordinate the plan with federal regional forest or other resource management plans as provided in the Federal Land Policy and Management Act of 1976 and federal regulations adopted pursuant to that act, including, but not limited to, Title 36, of the Code of Federal Regulations, part 219.7 and Title 43, of the Code of Federal Regulations, part 1610.3.

Wyo. Stat. Ann. §§ 18-5-201 through -208 (LexisNexis 2001).

## APPENDIX II

### Affidavit of Bill Collins

8. *Community Character.*

(a) The Teton County Comprehensive Plan and Land Development Regulations prepared and adopted by Teton County were aimed at preserving the character of the County. One theme was echoed time and time again: "Preserve the character of Teton County. Keep what we like about the County, and improve or change the things we don't like." (Teton Plan at p. 3-4) The overriding community character theme in the Teton Plan and TCLDRs is the County's goals of maintaining and preserving its small-town character, rural character and western character. The goals of preserving western and rural character are relevant to Section 2450.

(b) Community character has been a fundamental concept of planning and zoning for decades. Initially, the terms used to define and protect community character were land use and development intensity. Over the past 30 years or so, planning and zoning concepts have become more sophisticated and refined in the ways they define and address character issues. Character now is not only defined and regulated through land use and development intensities, but also by bulk, scale, height, lot size, landscaping, design criteria, scenic vistas and other aesthetic features.

(c) Chapter Three of the Teton Plan is entitled "Community Character." Chapter Three is divided into four parts: (a) Issues; (b) Summary, Statement of Goals and Objectives; (c) Implementation Strategies; and (d) Actions. The portion of Chapter Three devoted to "issues" opens with the following passage: "The preservation and enhancement of community character is perhaps the most fundamental and pervasive growth and development issue facing Teton County." (Teton Plan, 3-1) The "issues" statement expresses concern over "certain types of development, which are out of character with Teton County, regardless of the amount of land they occupy." (Teton Plan, 3-4) One such type of development is the scale of residential structures, described as "very large single-family homes of 5,000 square feet or more." (Teton Plan, 3-4) The "actions" statement of Chapter Three refers to the adoption of a new land development regulatory system (TCLDRs), one goal of which is to limit the maximum floor area of residential structures. Section 2450 implements that goal by limiting the amount of habitable space and total floor area to 8,000 square feet and 10,000 square feet respectively. Other sections of the TCLDRs implement that goal as well.

(d) The TCLDRs address community character in several ways. The regulations provided for clustering of housing units, leaving areas of contiguous open space that allow agricultural operations to continue, preserve scenic vistas and wildlife routes, and maintains the openness of Teton County while accommodating development. The TCLDRs also promote agricultural operations by exempting certain agricultural structures from permitting requirements or providing expedited review processes for agricultural structures. The regulations also include provisions that are aimed at preserving the long scenic vistas and the wildlife population that characterize Teton County. And finally, in relevance to this case, through Section 2450 the TCLDRs regulate the scale of development to maintain a scale of development similar to the past scale of development to preserve the character of Teton County. [1 At the time of adoption of the Teton Plan, this western and rural character in the Coun-

ty was set by ranches where the average house was only 1,342 square feet, where ranches often had several homes, and where the largest square footage on any single ranch complex was 6,988 square feet.] [Footnoted inserted into text]

(e) The scale of development is related to community character, as defined in the Teton County Plan, and the TCLDRs regulate the scale of development to preserve community character by a variety of provisions. Section 2450 is just one of those. Others are found in the schedule of dimensional limitations, Table 2400, which limits lot area, setbacks, floor/area ratios and maximum height. The setbacks describe the maximum ground floor area, and a maximum height creates a maximum volume. In urban and suburban districts, these factors are the primary scale and bulk determinants, and are geared to creating urban and suburban character types. In the larger lot Neighborhood Conservation districts, impervious surface can also become an important factor in determining scale of development. In the largest lots, those of estate or rural character, Section 2450, with its maximum scale requirement of 8,000 square feet for the residence is the operative factor, ensuring building scale is consistent with the rural and estate character districts. Character in these areas is defined by buildings whose scale is such that they are background elements. Teton County's approach to regulating the character of development in different districts through land use, scale, height, and other regulations, is common in modern land development regulations. Furthermore, as is explained above, Section 2450 is one of the planning, and zoning tools that further the community character goal established by the County in the rural and estate districts by regulating the scale of development.

(f) There is also a social aspect to the concept of Teton County community character. As noted in ¶ 8(c) above, the "issues" statement in Chapter Three, Community Character, expresses concern over "certain types of development, which are out of character with Teton County, regardless of the amount of land they occupy." (Teton Plan,

3–4) One such type of development is the scale of residential structures, described as "very large single-family homes of 5,000 square feet or more." (Teton Plan, 3–4) At the time that the Plan was proposed, debated and enacted, homes with large amounts of living space were a relatively new occurrence in Teton County. These homes with large amounts of living space represented a change away from the small western community; they were viewed as a threat to a socially diverse community. If left unchecked, homes with large amounts of living space were viewed as eroding the community's very sense of character. Many viewed these large homes as representing conspicuous consumption and using disproportionate consumption of resources.

(g) Teton County recognized and agreed during the planning process for the Teton Plan and TCLDRs that the County had historically been a western ranching community where buildings take a backseat to the unique landscape of wide-open spaces. At the time of adoption of the Teton Plan, this western and rural character in the County was set by ranches where the average house was only 1,342 square feet, where ranches often had several homes, and where the largest square footage on any single ranch complex was 6,988 square feet. One of the policies embraced in the Teton Plan and the TCLDRs is that the scale of future residential development needed to be consistent with the scale of residential development that existed prior to adoption of the plan if the County's rural and western character was to be maintained. Section 2450, TCLDRs, which limits the size of single-family residences to 8,000 square feet, helps achieve this objective (along with other regulations in the TCLDRs), and consequently is an important planning and zoning tool in the County's effort to preserve and protect its community character.

9. *Community Aesthetics.*

(a) Inherent in the goal of protecting and preserving community character is the goal of protecting and maintaining community aesthetics. Teton County is one of the most aesthetically pleasing counties in the country.

Contributing to this aesthetic are the broad scenic vistas and the dominance of the rural natural landscape over built structures.

(b) Generally, community aesthetics focuses on the appearance of development in relation to the community—its height, scale, the size of the lot it sits on, landscaping, and other design and architectural features.

(c) Community aesthetics is an important part of the County's goals of protecting and promoting community character because part of the character goal includes protecting and preserving the relationship between the natural and built environments, particularly in areas of rural character.

(d) Section 2450 specifically furthers the goal of protecting and preserving community aesthetics because it regulates the scale of single-family residences primarily in the rural and estate areas of the County, assisting in achieving an aesthetic that preserves both rural character and western character, by enabling the natural landscape to dominate over structures.

(e) A second aesthetic component of the rural and western character embraced by the County in the Teton Plan and TCLDRs is protecting and preserving scenic vistas. Traditionally, homes in the County were one-story ranch houses that hugged the ground and provided a low roofline that preserved these vistas. By the early 1990s, however, development of much larger two-story residential edifices of a scale that was greater than the traditional farmhouse and ranch development had begun to occur, affecting these vistas and the aesthetic of the County.

(f) Regulating and limiting residential development to a certain square footage as Section 2450, TCLDR does, is a reasonable way to assist in the achievement of this goal of preserving and protecting community aesthetics, since it maintains the development of residential buildings in the rural and estate areas of the County at a certain relationship to the natural environment and regulates the blocking of vistas. A square footage limit is a reasonable zoning technique that is routinely effective at furthering the County's goal, is understood by the general

public and contractors, and is relatively easily administered.

10. *Maintaining Land Use Compatibility/Character Type Compatibility.*

(a) A key concern in land use planning and zoning generally is that neighboring land uses are compatible with one another. Generally this land use compatibility concern is directed at the land uses within the same area or district that have external adverse impacts because of the use itself (e.g., the location of a store in a residential neighborhood). The community character approach used in the Teton Plan and land development regulations (the use of community character types) looks beyond land use to determine the elements that create similar or consistent character or which differ substantially in character, creating incompatibility or even nuisances for neighboring development.

(b) Regulating the floor area of single-family residences in the County as Section 2450 does furthers the County goal in the Teton Plan of maintaining compatibility within areas of specific character types and land uses. The reason is that Section 2450 prevents the potential adverse impacts that large-scale single-family homes can have on residential neighborhoods. Frequently, large homes (certainly those with over 8,000 square feet of habitable space) can be used more like tourist accommodations, corporate retreats, or entertainment complexes. Bunk rooms or large numbers of bed rooms are designed to accommodate many visitors. Huge dining rooms, game rooms, and other spaces are designed like tourist or corporate retreats to handle large groups of people. When used for private, business or corporate purposes, the character of the large-scale single-family use changes as traffic rates and noise levels increase and activities on the site change, resulting in serious incompatibilities with the general character of single-family areas. Regulating maximum floor area limits the potential for these types of land use incompatibilities.

11. *Housing Affordability.*

(a) Encouraging housing affordability is also a goal embraced by the County in the

Teton Plan that Section 2450 furthers (See Teton Plan, Chapter 5). Because of a number of factors, the County is and has been affected by a severe housing affordability problem. This is created by the fact that a growing number of persons who work in the County and have lived in the County can no longer afford to live in the County, or purchase homes in the County. A survey of employees in 1998 indicated that over 66 per cent of the employees in Teton County earned less than $30,000 a year.

(b) There is no single planning, zoning or other solution that acting alone, will address a housing affordability problem. Instead, the problem must be managed through the use of numerous regulatory and other programs, and then constantly revisited and revised and improved over time. Teton County is using both regulatory (Secs, 49400, 49500 and 2450, TCLDRs) and programmatic (the work of the Teton County Housing Authority) approaches to addressing the housing affordability problem in the County.

(c) Chapter Five of the Plan is entitled "Affordable Housing." The very first paragraph of the chapter explains that many of the County's homes are used as second homes, or vacation homes; that the demand for these homes is created by non-residents who have acquired their purchasing power outside the County; that this demand by non-residents with greater purchasing power [has] caused an upward spiral in land prices, unaffordable to most County residents; that as a result, residents have been displaced outside the community:

> From 1970 to 1990, Teton County created more jobs than it did homes, leaving the housing supply far below demand. Furthermore, much of the new and existing housing stock has been occupied *as second or vacation homes, not by residents. Since second home owners can generally pay more than residents when purchasing property, price of property in Teton County has become unaffordable to most Teton County residents.* As a result, many of those employed in the County have been forced to find housing outside the community, share housing with others, live in substandard or inadequate housing, or hold more than one job in order to afford the limited housing that is available.

(Plan, *Affordable Housing, p. 5–1)* (emphasis added). The Plan characterizes this increase in housing costs, substantially in response to second and vacation housing demand, as the *"root* of the affordable housing problem." (Plan, *Affordable Housing, p. 5–1)* (emphasis added). Even the "issues" statement in Chapter Three, *Community Character,* recognizes the connection between second and vacation housing demand and the upward spiral of land costs, noting that "[a] strong *second* home market has caused residential property values to skyrocket." (Plan, *Community Character, p. 3–3)* (emphasis added).

(d) The significance of the displacement of residents is twofold: 1) the displacement affects the ability of the business community to effectively conduct business, due to lack of hiring choices, resulting in both a lower quality of service and staff shortages. (Plan, *Affordable Housing, p. 5–8);* and 2) the displacement affects the County's social structure:

> Social and economic classes that once mingled in the community are growing apart as households that cannot afford homes in Teton County are relocating to Teton Valley, Idaho, Alpine, and Bondurant. The community as a whole has decried this trend. As described in the Community Character chapter, maintaining both a social and economic diversity within Teton County is very important to its residents.

(Plan, *Affordable Housing, p. 5–8).*

(e) According to the Plan, these second or vacation homes are disproportionally large. People seeking locations to build second or vacation homes are more likely to build large homes. One of the guiding principles in the chapter on Community Vision declares that *"[h]igh-end residential ... development* will not be permitted to dominate the community at the expense of affordable housing opportunities for permanent residents." (Plan, p. 1–7) (emphasis added). The connection between very large single-family homes and second, or vacation, homes also finds support in the issue paper on affordable housing:

One of the elements driving the housing affordability problem is the gap between what people of modest income and those at the top of the market can afford. *Jackson Hole's recent growth has not been so much due to new year-round residents, but rather is from the very affluent who build second homes ranging from 5 to 12 times the size of most normal housing in the valley.* It is impossible for middle income residents to compete in this market.

Exh. 3–C (page 28 of the Issue Paper on Affordable Housing) (emphasis added).

(f) The chapter on Affordable Housing suggests a strategy limiting the gross living area which could be built on a given lot as a way to slow rising land costs:

**Maximum floor area ratio**—*This strategy would limit the gross living area which could be built on a given lot. Usually such a requirement relates directly to community character objectives. Under certain land market conditions, however, it can tend to slow the upward spiral of land costs by clearly defining the amount of development permitted on a lot-by-lot basis.* It is unlikely, however, that such limits will bring new dwelling units within the range that is affordable by residents of the community.

(Plan, *Affordable Housing,* p. 5–15) (emphasis added).

(g) According to the Plan, then, limiting the gross living area which could be built on a given lot, arguably slows the upward spiral of land costs, which, in turn, will make land more affordable for housing that resident workers can afford. In this way, limiting the size of single-family homes to a certain number of square feet slows the upward spiral of land costs, which, in turn, makes more available housing that resident workers can afford. By making affordable housing more available for resident workers, Section 2450 promotes the social and economic diversity of Teton County's population.

(h) The Pitkin County, Colorado, Affordable Housing Regulation Support Study, attached to this affidavit as Exhibit 3–B, supports the connection between very large single-family homes and the problem of affordable housing. That Study concludes that the employment required to operate and maintain a residence rises with the size of the residence at an *exponential,* rather than lineal rate. Since, according to the Study, "most of those employed [for the operation and maintenance of large single-family residences] will receive wages and salaries that place them in a position of economic stress in terms of their ability to purchase or rent housing," larger single-family residences increase the number of low wage service sector jobs at a greater rate than smaller houses. As one of the regulatory approaches, Section 2450, TCLDRs furthers the affordable housing goal by mitigating against the rise in the number of low wage employees in the County.

12. I am not aware of any violations of Section 2450 of the Land Development Regulations other than the violation of Section 2450 which is the subject matter of the above entitled matter. [Emphases in original; some footnotes deleted.]

### APPENDIX III

### COMMUNITY VISION

Teton County's popularity as a gateway community and destination resort skyrocketed during the 1980's, bringing with it dramatic increases in population and development. The 1980's marked the second consecutive decade of above-average growth, and residents feared they were losing control over their future. Their quiet western community had mushroomed into a flourishing resort that threatened to leave residents' needs and values behind.

As the decade drew to a close, residents and community leaders of Teton County and the Town of Jackson recognized that the time to confront their concerns had come. Rapid growth was diminishing the small town values and western heritage cherished by so many. Housing had become so expensive and scarce that it was forcing some residents to leave the community. Development was beginning to disrupt open ranchlands and natural resources. Improvements in the valley's infrastructure—transportation, sanitary sewer, parking—lagged sharply behind popu-

lation and visitation growth. Existing land development regulations were proving inadequate to deal with these pressures, and residents began to express the need for a system which would do a better job of managing the changes they were seeing in Teton County's character.

In 1989 and 1990, the Town and the County began independent but parallel information-gathering efforts to determine what residents envisioned for Teton County's future. The County initiated "small-area" meetings where planners met informally with residents of various areas of the county. Meanwhile, Town planners divided Jackson into seven neighborhood planning areas and conducted similar workshops of their own.

Citizens attending Teton County's Small Area Plan meetings and the Town's series of neighborhood meetings made it abundantly clear that they were not satisfied with the recent directions of the area's growth and development. Issues most often cited were increased traffic, commercial growth, and lack of affordable housing opportunities. They were articulated as issues of character: people felt their community was disappearing.

Both local governments recorded residents' comments with the intent of using that information to develop separate land use and development plans with implementing regulations. In considering what residents were telling them however, local officials realized that growth and development issues such as transportation, air and water quality, and wildlife habitat do not stop at jurisdictional boundaries. They saw that the character of Jackson was interdependent with that of Kelly, Moran[,] Wilson, and Alta. Clearly, a major cooperative planning effort was needed. Neither jurisdiction could hope to solve community-wide problems without the help and support of the other. What direction was growth taking? What would Jackson and Teton County look like at buildout under the regulations in effect at that time? Much of Teton County's ranchlands, with its pastures, hay meadows, and broad sweeping vistas, was zoned for development at one unit per three to six acres. Dividing a 1,000–acre ranch into three- to six-acre lots does not preserve rural character, and does not provide either affordable housing or open space.

Many residents felt the community was becoming out of balance, with resort and commercial development far outpacing the growth of employee units and other types of affordable housing. While "the market" was producing some affordable housing, it was not keeping up with the need. In the Town, affordable housing was often being built at the expense of established, mostly single-family neighborhoods which happened to be zoned MR–2 or MR–4, while existing affordable housing stock was continuing to be displaced by non-residential uses in Core Commercial and MR–4 zones.

The community and elected officials took action. Several community groups, state and federal agencies, consultants and residents contributed to a joint planning effort. Public forums were held to outline the most commonly voiced concerns. One such forum was the Successful Communities workshop, which drew more than 300 participants in March, 1990. During this workshop, participants identified Jackson Hole's natural and community assets as well as areas of concern, from which a vision statement was derived. Finally, specific actions to bring about the vision were identified, under the themes of (1) preservation of the high quality of the natural and built environment; (2) wildlife protection; (3) encourage economic and social diversity; (4) growth management; (5) preservation of Jackson Hole's quality of life; and (6) just compensation.

In response to the identified assets and concerns, a consulting team headed by Lane Kendig, Inc., was selected from a group of nationally recognized planners to produce a comprehensive plan and draft development regulations. During the information gathering or "Reconnaissance" phase of the planning process, the consultant team produced a series of five "Issues Papers" in which they evaluated economic development, natural resources, affordable housing, population and growth, and community character in Teton County. Public officials, local planning staffs, and the consultants met with the general public during a series of workshops to

discuss the papers and possible strategies for addressing the issues which they raised.

Through the summer and early fall of 1991, hundreds of residents gathered and spoke at moderated, informal roundtable discussions at the Jackson Hole High School. They shared their concerns for Teton County's future, and told one another about personal likes and dislikes with respect to the Town's and County's development. Lane Kendig also gave the public some early thoughts on how their concerns might be addressed, and he personally led several question and answer sessions.

### Visioning

From the comments and discussions at the workshops and mediated roundtables through the Reconnaissance phase, a vision for Teton County's future began to emerge. Residents expressed a strong desire to retain a rural western character and a sense of true community. They wished to maintain a socially and economically diverse population and to not become a resort where only the wealthy can afford to reside. They were committed to preserving open space, affordable housing, and wildlife, and to avoid making the mistakes they perceived had been made by other resort communities.

The vision includes:

- scenic vistas preservation;
- wildlife diversity and abundance;
- a continuation of ranching and other traditional agriculture;
- good quality air and water;
- a strong economy based upon visitation, offering unique visitor experiences in the outdoors;
- a balanced community not dominated by lodging and resorts;
- nodes and clusters of affordable homes; and
- good schools, parks, and other services to support community life.

In addition, the Town of Jackson focused on local and neighborhood concerns:

- safe, secure residential neighborhoods with quiet streets;
- a variety of housing types to support a diverse community;
- an efficient transportation system which is safe for pedestrians and cyclists as well as vehicles;
- a vital, pedestrian-oriented downtown area which welcomes both visitors and locals;
- major streets which are attractive and set a positive community image;
- protected and restored resources, such as the Town's hillside areas, and Cache and Flat Creeks; and
- residential and commercial buildings which reflect Jackson's heritage, character, and image.

Clearly, the results of this visioning process presented a very tall order for the officials and planners charged with formulating a comprehensive plan including land development regulations. On the surface, at least[,] some of the goals and desires expressed appeared to conflict or compete with others. For example, how could the integrity of single-family neighborhoods be preserved while still providing a variety of housing types and opportunities to support a diverse population? If open space and wildlife habitat were to be preserved, how could housing be truly affordable?

Embracing these conflicts, the visioning provided an umbrella guideline that would structure the entire planning process. A plan needed to be formulated which would identify the critical elements that define the character of the Town of Jackson and Teton County, and that the plan would recommend how community character could not only be preserved but actually enhanced through positive change.

### Issues Mapping

A critical link between the visioning and the articulation of goals, objectives and strategies to realize the vision is "Issues Mapping." As the term implies, issues mapping is a graphic and geographic depiction of community planning issues and opportunities, and the spatial relationships among them. The issues map provides a framework for understanding the issues analyzed in the chapters which follow

this Community Vision. It also provides a guideline against which proposed land development applications and public investments can be measured.

The Community Issues Map for the Town of Jackson is both vision and direction for future growth and development. It indicates areas where residents and officials find the present character desirable, and therefore, want it preserved. In other areas, an auto urban or suburban character should be preserved; at the same time it is recognized that some enhancement is needed. In practical terms, this means that new development in these areas should contribute to the existing character and not be allowed to start a shift or trend toward another more intense character type. Much of East Jackson, Upper Cache Creek, and the Sage Addition area are recommended for enhancement.

The Issues Map illustrates areas with significant environmental constraints and natural resources within the Town which must be considered and preserved, to the extent possible, when development is proposed. There are steep slopes in north Jackson, west of Flat Creek, on the north side of Snow King Mountain, and along the east side of South Highway 89. Some of these areas are not suitable for building, and any development needs to be clustered on the most suitable areas of each site. Parts of the butte side slopes in north Jackson are crucial winter range for mule deer, so development should be limited to allow the animals continued use and movement through the area. Forested areas on Snow King Mountain are used extensively by moose and deer. Although not designated as crucial winter range, these areas should also receive some degree of protection.

Jurisdictional wetlands along Flat Creek in the Karns Meadow and immediately north of High School Road are also designated for protection on the Issues Map. As the most prominent natural resource in all of Jackson, but one which has not been treated as the community amenity it could be, Flat Creek is also designated as a special restoration corridor. Details of the restoration plan for Flat

Creek may be found in Chapter 4, Natural Resources.

Affordable housing nodes and other areas for higher density residential development are indicated, mainly in West Jackson where commercial services are available, transit is provided, and overall access service is plentiful. The Issues Map recognizes the distinction between general community commercial needs in the shopping areas along W. Broadway and lodging and visitor services which should be focused primarily on the Jackson core area. The Issues Map illustrates that the area in and around Snow King Resort will continue to be the major center for resort-type uses in Town.

The Community Issues Map also depicts such non-regulatory issues as urban design and transportation. It indicates that special treatments are needed for the Town's three major gateways: north and south Highway 89, and at Highway 22 entrance to Town. Through a properly designed combination of monument signage and landscaping, a favorable first impression of the community and a clear sense of arrival will be created, with the message that the traveler is leaving one type of character and entering a distinctly different type.

The "transit nodes," which are major transfer points or other key facilities associated with the bus system, are also indicated. For this system to expand to meet community-wide service needs, a major terminal and park-and-ride facility is recommended for consideration at the intersection of Highways 89 and 22. The Map also designates major links of the pathway system, reflecting the importance given in the visioning process to the ability to travel about the Town and County on foot, by horseback, by cycling, or cross country skiing.

The Issues Map indicates the need for special design guides to preserve the unique pedestrian character of the Town Square. As well, the commercial areas along south Highway 89 are designated for design improvements to parking, access, internal circulation, signage and landscaping to enhance the existing character and mitigate the Highway's "strip commercial" appearance.

In Teton County, the major issues tend to be broader and were of necessity mapped at a much smaller scale. The County Issues Map primarily depicts three areas of concern. The first is "open space." These are lands on which ranching should continue, wildlife habitat preserved, and the visual qualities of scenic vistas protected.

Examples include the hay meadows of South Park, the Spring Gulch scenic area, ranchlands along the Teton Village road, Buffalo Valley and the western most entrance to Teton County from Alta. These lands also include the Snake, Hoback, Gros Ventre and Buffalo Fork river corridors and those hillsides and butte sides which are crucial winter range for ungulates. These areas should be kept free of development to the maximum extent possible to help preserve rural character, critical wildlife habitat and important image-setting scenic vistas and river corridors, and to encourage the continuation of ranching and other types of traditional agriculture as a vital part of the community's character. The County should encourage the preservation of the rural character, critical wildlife habitat and important image-setting scenic vistas and corridors, and encourage the continuation of ranching and other types of traditional agriculture as a vital part of the community character. Where possible, the County should be flexible with its development regulations as an encouragement to landowners to permanently protect these wildlife, scenic and agricultural areas. In addition, where non-regulatory options are available, these should be encouraged. For example, a land trust's resource analysis in preparation for a conservation easement, may be sufficient to replace the County's site analysis.

The second type of area identified on the County Issues Map are the "neighborhood conservation" areas. These are lands which are already subdivided, and which have been determined to generally constitute acceptable patterns of development within already established boundaries. These lands include the vast majority of the large-lot platted subdivisions in the County, as well as planned developments, such as Rafter J, Spring Creek Ranch, Boyles Hill (Indian Springs) and Teton Pines. In these areas development will be allowed to continue as it was originally approved, with very little (if any) change to be effected by the land development regulations adopted to implement this Plan.

The third type of area shown on the County Issues Map is how new development relates spatially to the community's overall vision. These are the areas seen as appropriate for future growth and include the Teton Village and Grand Targhee Resorts. This third type also includes new limited commercial areas near the Aspens and in Wilson and Hoback Junction, intended to meet the basic service needs of residents.

In addition, perhaps the most important areas for future development are the housing "cluster targets." These are areas which, from the standpoint of access, ability to provide services and/or contiguity with existing development, are most appropriate for relatively high density housing. One such area is in the northwest part of South Park at the south side of High School Road across from Cottonwood Park. Smaller potential affordable housing nodes are designated in Wilson and Hoback Junction adjacent to existing communities. It is this clustering of development potential, with its required open space preservation, that allows rural character objectives, such as wildlife and scenic resource protection, to be achieved.

Like the Town map, the County Issues Map also reflects an increasing awareness of the need for alternatives to automobile transportation. Areas to be considered for new or expanded transit service are depicted, including Wilson and Hoback Junction. Major links in the proposed pathway system are also shown.

## Vision Statement

In order to provide the finishing touches to the visioning process and to better translate the community vision into plans and regulations, a vision statement was drafted, based on stated values of the community.

It is the vision of the citizens, planners and elected officials, who have all contributed to

this plan, to guide and manage change and development to:

- support and promote a diverse social and economic population that includes a resident work force;
- preserve the traditions and character of the Rocky Mountain West and Wyoming, including ranching and through architectural design;
- promote economic sustenance that does not depend on population growth;
- set aside. for generations to come, scenic vistas and wildlife habitat;
- maintain and enhance environmental quality, including air and water quality;
- maintain outdoor recreation and adventure opportunities; and
- offer a spectrum of housing types, especially for resident workers.

The vision also includes the intent that development on private lands in Teton County be compatible with surrounding public land values and uses, including Grand Teton National Park, Yellowstone National Park, and Bridger–Teton National Forest, because all towns, neighborhoods and resorts in Teton County are integral to the Greater Yellowstone Ecosystem.

Fortunately, Teton County residents enjoy common values upon which they can build a future. This planning effort sought a "common ground" among several points of view. There is widespread commitment for protection of Teton County's natural resources, outdoor recreational opportunities, sense of community and small-town feeling and social diversity.

The Comprehensive Plan for Teton County needs to acknowledge and protect the benefits of growth while adopting reasonable limits. In an effort to create a "best-choice" future for our community and to design a regulatory system that serves this purpose, the benefits of growth must be balanced with the benefits of growth management.

The guiding principles shown below have been articulated to reconcile the benefits of growth with the benefits of growth management:

1. Teton County's wildlife and scenic resources are a local and national treasure, and, therefore, the community recognizes a stewardship responsibility for their protection. Future development in Teton County will take place in this context.

2. Teton County is a community first and a resort second. Social diversity is a defining characteristic of the community, and sufficient housing is seen as essential, to retain that characteristic in the future. High-end residential and commercial development will not be permitted to dominate the community at the expense of affordable housing opportunities for permanent residents.

3. The intent of this Plan is to create conditions for a sustainable visitor-based economy not dependent upon growth, and an economy that reflects the unique small-town, Western commercial character of Jackson, and the outdoor recreational opportunities of Teton County as key components of the visitor experience.

4. As a community grounded in values of individualism, fairness and hospitality, the intent of this Plan is to provide property owners and local businesses with as much flexibility as possible in the use and development of their property. Local elected officials will be entrusted with discretionary decision-making power to protect public health, safety and welfare.

The Plan chapters which follow provide the means to achieve the vision and guiding principles through a detailed analysis of issues, establishment of goals and objectives, consideration of strategies and selection of appropriate actions. However, these chapters do not represent the culmination or end-point of the process. The term "planning process" defines the on-going or cyclical nature of planning. While certain aspects of the planning program have been formulated to the point that they are ready for implementation, others require continuing monitoring and analysis before they too are ripened.

The most significant areas in which the planning process will continue following adoption of this Plan are:

1. Definition of the fair share of affordable housing to be provided by new residential, commercial and resort development;

2. Specification of fees to address the impacts of development on parks and recreation, schools and roads;

3. Consideration of growth management techniques intended to insure balance among the residential, commercial and resort development sectors and to influence the rate of community change to avoid cycles of community "boom and bust;"

4. Establishment of planning capacity guidelines, providing a range for each resort's ultimate development, within which each resort can develop its own master plan;

5. Formulation of historic preservation design guidelines;

6. Re-running the County's transportation model to determine the intermodal transportation improvements necessary to serve the vision expressed by this Comprehensive Plan.

This plan is intended to guide the inhabitants of Teton County, Wyoming, into the 21st century in a manner that honors Jackson Hole and Alta's heritage and setting, and endows future generations. The Plan also seeks to build on conditions existing in 1993.